UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHIKEMA WILLIAMS, administratrix of the estate of FREDERICK VELEZ, SHIKEMA WILLIAMS, administratrix of the estate of CHRISTINE COX, FREDERICK HALL, and SHAMIA HALL,<br><br>                            Plaintiffs,<br><br>          -against-<br><br>SUPERINTENDENT SUSAN CONNELL, DEPUTY SUPERINTENDENT PETER NAUGHTON, SGT. RALPH CIACCIA, C.O. THEODORE ELLIOTT, C.O. ALAN ANDRE, C.O. LESLIE BAILEY, C.O. DAVID PIERSALL, C.O. MICHAEL BOLEN, C.O. VINCENT SANSEVIERI, C.O. K. KLEIN, C.O. J. MCNEIL, C.O. B. FREY, C.O. GATLEY, C.O. AVERY, CAPT. EARL BELL, C.O. THEALL, and "JOHN DOES" 1-15 (names being fictitious and presently unknown),<br><br>                           Defendants. | 17-Civ-750 (TJM) (ATB) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PURSUANT TO RULE 12(B) OF THE FEDERAL
RULES OF CIVIL PROCEDURE**

Plaintiffs, by and through their attorneys, hereby request that this Honorable Court deny

defendants' motion to dismiss for the reasons set forth in the attached Memorandum of Law.

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES  ................................................................................................ii

PRELIMINARY STATEMENT................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 1

GOVERNING LAW ................................................................................................. 7

ARGUMENT ............................................................................................................ 8

POINT I..................................................................................................................... 8

      THERE IS NO BASIS TO DISMISS THE FIRST, SECOND, AND THIRD
      CAUSES OF ACTION

POINT II ................................................................................................................ 18

      THE HALL AND COX PLAINTIFFS' CLAIMS ARE ACTIONABLE, AND
      THERE IS NO BASIS TO DISMISS THE FOURTH, FIFTH, SIXTH, SEVENTH,
      EIGHTH, AND NINTH CAUSES OF ACTION

CONCLUSION ....................................................................................................... 21

## TABLE OF AUTHORITIES

Page

### U.S. Supreme Court Cases

Board of Dir. v. Rotary Club,
   481 U.S. 537 (1987) ..........................................................................................20

Estate of Bailey by Oare v. Cnty of York,
   768 F.2d 503 (3d Cir. 1985) ...........................................................................19

Farmer v. Brennan,
   511 U.S. 825 (1994) ...............................................................................8, 9, 14

Santosky v. Kramer,
   455 U.S. 745 (1982) ........................................................................................19

United States v. Georgia,
   546 U.S. 151 (2006) ..........................................................................................8

### Federal Cases

5 Borough Pawn, LLC v. City of New York,
   640 F.Supp.2d 268 (S.D.N.Y. 2009) ..............................................................16

Anderson v. Branen,
   17 F.3d 552 (2d Cir. 1994) .............................................................................14

Bell v. City of Milwaukee,
   746 F.2d 1205 (7th Cir. 1984) .............................................................. passim

Berry v. City of Muskogee,
   900 F.2d 1489 (10th Cir. 1990) ......................................................................13

Brown v. Artus,
   647 F. Supp. 2d 190 (N.D.N.Y. 2009) ...........................................................17

Brown v. Budz,
   398 F.3d 904 (7th Cir. 2005) ..........................................................9, 10, 11, 17

Brown v. North Carolina Dept. of Corr.,
   612 F.3d 720 (4th Cir. 2010) ..........................................................................10

Buchy v. City of White Plains,
   2015 WL 8207492 (S.D.N.Y. Dec. 7, 2015) ..................................................14

Case v. Ahitow,
    301 F.3d 605 (7th Cir. 2002)....................................................................10

Chase Group Alliance LLC v. City of New York Dept. of Finance,
    620 F.3d 146 (2d Cir. 2010)...............................................................7, 15

Cohen v. Koenig,
    25 F.3d 1168 (2d Cir.1994)....................................................................8

Colon v. Coughlin,
    58 F.3d 865 (2d Cir. 1995)...................................................................15

Conti v. City of Fremont,
    919 F.2d 1385 (9th Cir. 1990)...............................................................20

Cottone v. Jenne,
    326 F.3d 1352 (11th Cir. 2003)............................................................11

D'Olimpio v. Crisafi,
    718 F.Supp.2d 340 (S.D.N.Y. 2010) ...................................................16

Dawkins v. Gonyea,
    646 F.Supp.2d 594 (S.D.N.Y. 2009) ...................................................16

Figueroa v. Aponte-Roque,
    864 F.2d 947 (1st Cir. 1989) ................................................................16

Fisher v. Koehler,
    692 F.Supp. 1519 (S.D.N.Y. 1988).................................................12, 15

Flint v. Kentucky Dep't of Corr.,
    270 F.3d 340 (6th Cir. 2001)................................................................11

Grandstaff v. City of Borger,
    767 F.2d 161 (5th Cir. 1985)................................................................19

Greene v. New York,
    675 F.Supp 110 (S.D.N.Y. 1987).........................................................18

Guerrero v. City of N.Y.,
    2017 WL 2271467 (S.D.N.Y. May 23, 2017).......................................14

Hamilton v. Fischer,
    2013 WL 3784153 (W.D.N.Y. July 18, 2013).......................................15

Hardy v. Dist. Of Columbia,
    601 F. Supp. 2d 182 (D.D.C. 2009) ......................................................9

Harper v. Lawrence County, Ala.,
    592 F.3d 1227(11th Cir. 2010).......................................................................16

Hart v. Sheahan,
    396 F.3d 887 (7th Cir. 2005).........................................................................12

Hayes v. N.Y.C. Dep't of Corr.,
    84 F.3d 614 (2d Cir.1996)..............................................................................9

Hearns v. Terhune,
    413 F.3d 1036 (9th Cir. 2005).......................................................................11

Hodgers-Durgin v. De La Vina,
    199 F.3d 1037 (9th Cir. 1999).......................................................................19

Horton v. Cockrell,
    70 F.3d 397 (5th Cir. 1995)...........................................................................12

Janes v. Hernandez,
    215 F.3d 541 (5th Cir. 2000).........................................................................11

Kass v. City of New York,
    864 F.3d 200 (2d Cir. 2017)............................................................................8

Kelson v. City of Springfield,
    767 F.2d 651 (9th Cir. 1985).........................................................................19

Krein v. Norris,
    309 F.3d 487 (8th Cir. 2002).........................................................................12

Lanorith v. Truscelli,
    2017 WL 3634600 (E.D.N.Y. Aug. 22, 2017)..............................................14

Laube v. Haley,
    234 F. Supp. 2d 1227 (M.D.Ala. 2002) ........................................................13

Lawrence v. Norris,
    307 F.3d 745 (8th Cir. 2002)....................................................................12, 16

Lee v. City of L.A.,
    250 F.3d 668 (9th Cir. 2001).........................................................................20

Logan v. Hollier,
    711 F.2d 690 (5th Cir. 1983).........................................................................19

Marsh v. Butler Cnty., Ala.,
    268 F.3d 1014 (11th Cir. 2001)................................................................11, 13

Mattis v. Schnarr,
    502 F.2d 588 (8th Cir. 1974)..................................................................................19

Mayoral v. Sheahan,
    245 F.3d 934 (7th Cir. 2001)....................................................................................8

Morales v. New York State Dep't of Corr.,
    842 F.2d 27 (2d Cir. 1988)......................................................................................10

Nogbou v. Mayrose,
    400 Fed.Appx. 617 (2d Cir. 2010) ...........................................................................8

Odom v. South Carolina Dep't of Corr.,
    349 F.3d 765 (4th Cir. 2003)...................................................................................10

Patel v. Searles,
    305 F.3d 130 (2d Cir. 2002)....................................................................................20

Redman v. Cnty of San Diego,
    942 F.2d 1435 (9th Cir. 1991)................................................................................13

Ruiz v. Estelle,
    503 F. Supp. 1265 (S.D.Tex. 1980) ........................................................................12

Ruiz v. Estelle,
    679 F.2d 1115 (5th Cir. 1982).................................................................................12

Sash v. U.S.,
    674 F.Supp.2d 531 (S.D.N.Y. 2009).......................................................................16

Saunders v. Chatham Cnty. Bd. of Comm'rs,
    728 F.2d 1367 (11th Cir. 1984)..........................................................................11, 12

Scott v. Fisher,
    616 F.3d 100 (2d Cir. 2010)....................................................................................15

Sheppard v. Beerman,
    18 F.3d 147 (2d Cir. 1994).......................................................................................8

Shrader v. White,
    761 F.2d 975 (4th Cir. 1985)...................................................................................13

Smith v. Arkansas Dep't of Corr.,
    103 F.3d 637 (8th Cir. 1996)........................................................................12, 14, 19

Smith v. City of Fontana,
    818 F.2d 1411 (9th Cir. 1987).................................................................................19

Stubbs v. Dudley,
    849 F.2d 83 (2d Cir. 1988) ............................................................................10

Tillery v. Owens,
    719 F. Supp. 1256 (W.D.Pa. 1989) ...............................................................13

Todaro v. Ward,
    565 F.2d 48 (2d Cir. 1977) ............................................................................12

Trujillo v. Bd. of Cnty Comm'rs,
    768 F.2d 1186 (10th Cir. 1985) .....................................................................19

Velez v. Johnson,
    395 F.3d 732 (7th Cir. 2005) ......................................................................9, 10

Winton v. Bd. of Comm'rs of Tula Cnty, Okla.,
    88 F. Supp. 2d 1247 (N.Okla. 2000) .............................................................12

Wright v. Smith,
    21 F.3d 496 (2d Cir. 1994) ............................................................................14

Young v. Quinlan,
    960 F.2d 351 (3d Cir. 1992) ..........................................................................11

## Statutes

42 U.S.C. § 1983 ..................................................................................... passim

## Rules

Fed.R.Civ.P. 8(d) ...........................................................................................8

Fed.R.Civ.P. 12(b)(6) .....................................................................................7

**PRELIMINARY STATEMENT**

This is a civil rights action in which plaintiffs Christine Cox, through the personal representative of her estate, Shikema Williams, Frederick Hall, Shamia Hall, and plaintiffs' decedent, Frederick Velez, through the personal representative of his estate, Shikema Williams, seek relief for the violation of their Eighth and Fourteenth Amendment rights due to defendants' deliberate indifference in failing to protect Frederick Velez from grievous and mortal injuries he sustained on April 24, 2009 while he was a prisoner in Oneida Correctional Facility.

While Shikema Williams brings claims only on behalf of Frederick Velez's estate for violation of the Eighth Amendment, the claims brought by Fred Velez's mother (Christine Cox) and children (Fred and Shamia Hall) are not brought in a representative capacity; these plaintiffs claim that defendants' reckless disregard for Mr. Velez's welfare and safety brought about Mr. Velez's death, and thereby violated their federal Fourteenth Amendment rights.

**STATEMENT OF FACTS[1]**

<u>A</u>.

On or about April 24, 2009, plaintiffs' decedent, Frederick Velez, was playing dominos with fellow inmate Jose Rodriguez in the dayroom of G-dorm in Building 21 of the Oneida Correctional Facility, a medium-security prison that was part of the New York State Department of Correction and Community Supervision (SAC at ¶ 40). Defendants Bailey, Piersall, Ciaccia, Bolen, McNeil, Elliott, Andre, Sansevieri, Gatley, Avery, and Theall, who were responsible for supervising each of the inmates in Oneida generally, and in the area of Oneida known as G-dorm, specifically, were on duty at that time in said area, and were responsible for the care, custody and control of plaintiffs' decedent and the other inmates in the area (<u>Id</u>. at ¶¶ 41-48).

---

[1] The facts stated herein are drawn from plaintiffs' Second Amended Complaint ("SAC").

At some point during that game, the two men began to argue, with Rodriguez accusing Velez of cheating, and Velez denying he had done so.  The argument escalated to the point where both men were shouting and cursing back and forth at each other angrily (Id. at ¶¶ 54-55). This argument occurred in the presence of, and was witnessed and heard by, the corrections officers who were on that dorm at the time, including defendants Bailey, Piersall, Ciaccia, Bolen, McNeil, Gatley, Frey, and Elliott – the corrections staff on G-Dorm, who were responsible for maintaining order and security in that dorm.  None of them took any steps to defuse the situation, however (Id. at ¶¶ 56, 62-64).  Indeed, the assigned staffing level for G-Dorm (which housed 64 inmates in a dormitory setting containing numerous cubicles and passageways) was woefully and deliberately insufficient for the prevention of violent interactions among the inmates (Id. at ¶ 58).

Eventually, the argument between Rodriguez and Velez turned physical, and the two men were physically fighting for an extended period of time, creating an enormous commotion in the recreation room that attracted many inmates to gather (Id. at ¶¶ 59-60).  Despite the fact that defendants Bailey, Piersall, Ciaccia, Bolen, McNeil, Gatley, Frey, and Elliott were supposed to make rounds of G-Dorm on the night of the incident, they either did not do so, or they did so, but failed to intercede in the conspicuous, brutal, vicious, and extremely prolonged assault of Velez by Rodriguez (Id. at ¶ 57).  None of these officers made any effort to break up the fight, maintain order, or separate Velez and Rodriguez, despite the commotion, noise, and obvious violent activity taking place under their noses (Id. at ¶ 64).

After several inmates broke up the fight between Rodriguez and Velez, Velez retreated to his assigned cubicle within G-dorm and remained in there (Id. at ¶ 65).  On his way there, Velez told defendants Bailey, Piersall, and Bolen what was going on between him and Rodriguez, including Rodriguez's threats of physical violence toward him, but Bailey, Piersall, and Bolen

took no steps to prevent the tensions between Rodriguez and Velez from escalating or to help protect Velez's health, safety and security (Id. at ¶ 116).

Rodriguez pursued Velez to his cubicle, all the while taunting him and threatening him with extreme physical violence (Id. at ¶ 65).  Over the next one to two hours, Rodriguez paced back and forth in front of Velez's cube with a nine-and-a-half-inch long shank in his hand, waving it about conspicuously, and loudly and vociferously taunting Velez, cursing at him, throwing objects and furniture at him, and shouting that he was going to kill Velez (Id. at ¶¶ 67-69).  During this same period of time, Rodriguez also defecated in a plastic container and from the walkway in front of Velez's cube, Rodriguez repeatedly threw feces from the container into Velez's cube while taunting him and threatening him with physical violence and death and brandishing the shank (Id. at ¶ 72).  All of this was done in the presence, and within eyeshot and earshot, of defendants, but none of them took any steps to break up the fight, maintain order, separate the two men, or protect the security and welfare of any the inmates, let alone Velez (Id. at ¶¶ 66, 70-71, 73).

Eventually, Velez took a mop and began to clean the feces from inside his cube.  When he stepped out of his cube in order to rinse out the mop, Rodriguez attacked Velez, punching him repeatedly.  Rodriguez then obtained a chair from the recreation room and threw it at Velez, after which he again physically assaulted Velez, punching him repeatedly.  Rodriguez threw the chair at Velez at least one more time, striking him with it and creating an extremely loud crashing sound and clamor, before resuming punching Velez.  Again, the corrections staff on the dorm observed and overheard all of this, but deliberately took no steps to separate the two men, to maintain the security and welfare of the inmates, including Velez, or to disarm Rodriguez and neutralize the situation (Id. at ¶¶ 74-82).

3

At this point, Rodriguez stabbed Velez in the chest with the shank.  This injury ultimately caused Velez's death (Id. at ¶ 83).  Much, if not all, of the fighting that occurred between Rodriguez and Velez prior to the stabbing occurred within mere feet of the officer station in G-Dorm, but none of the officers there – which included defendants Bailey, Piersall, Ciaccia, Bolen, McNeil, Elliott, Andre, Sansevieri, Gatley, Avery, and Theall – made any effort whatsoever to neutralize the escalating situation between the two men, quell the fighting, separate the inmates, or protect Velez's health, safety, welfare, and well-being or preserve his life (Id. at ¶¶ 84-85).

Moreover, these defendants failed to maintain sufficient audio or visual surveillance on G-dorm both generally and specifically in those areas of G-dorm where inmate Rodriguez confronted, assaulted, and murdered Velez (Id. at ¶ 98).  This was so despite the fact that these defendants were each aware that Rodriguez had vicious and violent propensities, and that he had amassed a substantial disciplinary history while incarcerated, including multiple incidents of violent conduct and fighting, multiple incidents of weapon possession, at least one previous assault on an inmate, over twenty Tier II infractions, and over ten Tier III infractions (Id. at ¶¶ 49-51, 97).

Indeed, defendants Bailey and Piersall each later admitted to investigators that they heard a commotion and observed Rodriguez and Velez fighting for a long period of time prior to Velez being stabbed, and that they observed Rodriguez repeatedly punching Velez and repeatedly throwing furniture at him, but that despite having had ample opportunity to break up the fight before Velez was stabbed, neither Bailey, Piersall, Bolen, or other defendant who was present ever tried to defuse the situation, separate Rodriguez and Velez, or maintain order and security in the dorm until after Velez had already been stabbed (Id. at ¶¶ 114-15).

<u>B</u>.

Prior to April 24, 2009, defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia directed that G-Dorm be used to house inmates in a dormitory setting – where inmates are housed together in an open area with individual cubicles – despite the known fact that the lack of privacy in such settings, and the ability of the inmates to access each other's assigned spaces without physical impediment, exacerbates tensions among prisoners and precipitates a far greater number of violent incidents among the prisoner population (<u>Id</u>. at ¶ 86).  Moreover, these defendants directed that G-Dorm house over sixty inmates of medium security classification – far too high a number of inmates for a physical space with its square-footage and physical layout (<u>Id</u>. at ¶ 87).  Additionally, these defendants created a policy and practice where over sixty inmates were assigned to G-Dorm, but where only one corrections officer was on duty in the dorm at any given time, with another officer "roving" between that dorm and another dorm (<u>Id</u>. at ¶ 88).  This was a woefully insufficient ratio of corrections personnel in proportion to the number of inmates to maintain order and security among in the dorm, and this inadequacy in staffing was a substantial factor in bringing about Velez's injuries and death (<u>Id</u>. at ¶¶ 89-90).

The combination of the high concentration of medium-security prisoners within that physical space, the cube-style dormitory setting and the concomitant lack of privacy and the access of the inmates to each other's assigned spaces, and the inadequate staffing of that dorm were all decisions made, endorsed, and ratified by defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia.  These factors, alone and in combination, were substantial factors in bringing about Velez's death (<u>Id</u>. at ¶ 91).

<u>C</u>.

Defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia also failed to implement any security measures and/or precautions designed to detect and eliminate weapons and contraband such as the shank used to kill Velez from inmates' cubes, belongings and persons, and from common areas, and thereby created an environment where weapons such as this could be concealed, possessed, maintained, and wielded by inmates without fear of detection, or if detected, without fear of disciplinary action (<u>Id</u>. at ¶ 92).     This failure and/or omission by each of these defendants was a substantial factor in bringing about Velez's injuries and death (<u>Id</u>. at ¶ 93).

<u>D</u>.

Prior to April 24, 2009, defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia were each aware that Rodriguez was an extremely violent felon who was incarcerated for attempting to murder three individuals, two of whom were police officers, and for illegally possessing a loaded handgun.   They also knew that Rodriguez had vicious and violent propensities, and that he had amassed a substantial disciplinary history while incarcerated, including multiple incidents of violent conduct and fighting, multiple incidents of weapon possession, at least one previous assault on an inmate, over twenty Tier II infractions, and over ten Tier III infractions.   Nevertheless, these defendants made the decision to classify Rodriguez as medium security and to house him in G-Dorm (<u>Id</u>. at ¶¶ 94-97).  Such a security classification for Rodriguez was improper and objectively unreasonable, and his placement in a dormitory setting in a medium security correctional facility was similarly improper and objectively unreasonable (<u>Id</u>. at ¶ 98).

These defendants failed to appropriately classify Rodriguez, failed to segregate him from the general inmate population, including Velez, and failed to put him in a psychiatric ward, as

well he should have been (Id. at ¶ 52).  Instead, these defendants placed and kept Rodriguez, a known habitually violent offender, with the general population, despite knowing of the risk of harm he posed to other inmates (Id. at ¶ 53).  Rodriguez's medium security classification and placement in a dormitory setting, decisions made by defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia, were substantial factors in bringing about Velez's injuries and death.

## GOVERNING LAW

In deciding a motion pursuant to either Rule 12(b)(6), the Court must liberally construe the claims, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Chase Group Alliance LLC v. City of New York Dept. of Finance, 620 F.3d 146, 150 (2d Cir. 2010). [2]  A court may dismiss an action pursuant to Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief."  Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994); Nogbou v. Mayrose, 400 Fed.Appx. 617, 619 (2d Cir. 2010) (citation omitted); Kass v. City of New York, 864 F.3d 200, 206 (2d Cir. 2017) (citation omitted).  Dismissal is warranted only if, all facts alleged are assumed to be true and all inferences drawn in the plaintiff's favor, the plaintiff cannot state any set of facts entitling him to relief.  Sheppard v.

---

[2] In Tolan v. Cotton, 134 S. Ct. 1861 (2014), in the related context of summary judgment motions, the Supreme Court recently emphasized the "importance of drawing inferences in favor of the nonmovant," and that "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."  Id. at 1866.  "By weighing the evidence and reaching factual inferences contrary to [the plaintiffs'] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."  Id. at 1868; see also Parker v. City of Long Beach, 2014 U.S. App. LEXIS 7346 *3 (2d Cir.) (Amended Summary Order) ("Absent incontrovertible evidence utterly discredit[ing] Parker's position, the district court was required to view the evidence in the light most favorable to Parker and to draw all reasonable inferences and resolve all ambiguities in Parker's favor") (internal quotation marks and citations omitted).  These principles, of course, apply with equal force in adjudicating motions to dismiss under Fed.R.Civ.P. 12(b)(6), where full discovery has not even taken place.

Beerman, 18 F.3d 147, 150 (2d Cir. 1994).   A plaintiff may also, of course, plead in the alternative.  Fed.R.Civ.P. 8(d).

## ARGUMENT

## POINT I

### THERE IS NO BASIS TO DISMISS THE FIRST, SECOND, AND THIRD CAUSES OF ACTION (Responding to Defendants' Memorandum, Points I and IV)

Defendants argue first that plaintiffs' first cause of action "fails to state a claim upon which relief may be granted" (Defendants' Memorandum of Law ("DM") at 3).  They also argue that the claims against all defendants other than Bailey and Piersall must be dismissed for failure to allege their personal involvement in any constitutional violation (DM at 9-14).   These arguments are uniformly meritless.

It is fundamental that prison officials have a constitutional duty to protect prisoners from violence at the hands of other inmates.  Farmer v. Brennan, 511 U.S. 825, 833 (1994); Mayoral v. Sheahan, 245 F.3d 934, 938 (7th Cir. 2001) ("Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners").[3]  To demonstrate an Eighth Amendment failure to protect claim, a prisoner must show both that (1) "he [was] incarcerated under conditions posing a substantial risk of serious harm"; and (2) "defendant prison officials possessed sufficient culpable intent."  Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir.1996) (citing Farmer, 511 U.S. at 834).  A prison official acts with sufficient culpable intent "if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Id.; see also Farmer, 511 U.S.

---

[3]  It is worth noting that "the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment" to the conduct of state actors. United States v. Georgia, 546 U.S. 151, 157 (2006) (noting that (internal citations omitted).

at 837–38 (noting that the deliberate indifference inquiry is subjective, requiring awareness of facts from which an inference could be drawn that "substantial risk of serious harm exist[ed]"). If there is evidence that a risk was obvious, a factfinder can conclude that the prison officials had actual knowledge of it.  Farmer, 511 U.S. at 842-43; Hardy v. Dist. Of Columbia, 601 F. Supp. 2d 182, 189-90 (D.D.C. 2009) ("In appropriate situations, subjective knowledge can be inferred from the obviousness of the risk").

Moreover, prison officials do not have to know the precise nature of the risk as long as they know that there is a serious risk to the inmate's safety.  See Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005) (where prisoner pushed an emergency call button and told staff he was having a conflict with his cellmate, officer's claim that he did not know the cellmate was holding a razorblade to the plaintiff's neck, or that the plaintiff would be raped, did not show that he lacked knowledge of the risk).  The risk could be personal to the specific inmate, or it could result from prison conditions or practices that are dangerous to all prisoners.  Farmer, 511 U.S. at 843; Brown v. Budz, 398 F.3d 904, 914-15 (7th Cir. 2005) (holding deliberate indifference can be established by knowledge either of a victim's vulnerability or of an assailant's predatory nature; both are not required).

Judged by these standards, the SAC sufficiently alleges that defendants knew of and disregarded excessive risks to plaintiffs' decedent's safety.  It details how defendants Bailey, Piersall, Ciaccia, Bolen, McNeil, Elliott, Andre, Sansevieri, Gatley, Avery, Theall, and Frey stood by and did nothing as they witnessed Rodriguez assault Velez over the course of several hours in a dormitory that was under those defendants' control.   This plainly alleges an Eighth Amendment violation by these defendants.  See Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988) (inmate's allegation that corrections officer on duty in dormitory

stood by and allowed attack on inmate by fellow inmate to occur was sufficient to state a Section 1983 claim against the corrections officer for deliberate indifference under due process clause); Stubbs v. Dudley, 849 F.2d 83, 87 (2d Cir. 1988) (where a corrections officer "had adequate time to assess the serious threat facing [the inmate] and a fair opportunity to afford him protection at no risk to himself or the security of the prison but nevertheless callously refused to permit [the inmate]  to pass with him to safety behind the administration door," the officer's conduct "could reasonably be found to be deliberate indifference, tantamount to a knowing willingness that the harm occur") (internal quotation marks and brackets omitted); Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 772 (4th Cir. 2003) (officers who failed to take action when they saw other prisoners trying to get through a fence to attack the plaintiff could be liable under the Eighth Amendment); Brown v. North Carolina Dept. of Corr., 612 F.3d 720, 723 (4th Cir. 2010) ("Brown's complaint alleges that Officer Simms was in 'the Block' when the assault occurred. A reasonable person could infer from that statement that Officer Simms was aware of the attack, and that his failure to intervene represented deliberate indifference to a serious risk of harm").

Moreover, the SAC alleges that Velez informed these defendants of Rodriguez's threats of physical violence toward him, yet they failed to take any action.  See Velez, 395 F.3d at 736 (officer who knew of risk of assault could be liable for not acting to prevent it); Case v. Ahitow, 301 F.3d 605, 606-07 (7th Cir. 2002) (defendants could be held liable where they knew another prisoner wanted to "teach [plaintiff] a lesson," and did not act to keep them separate); Flint v. Kentucky Dep't of Corr., 270 F.3d 340, 353-54 (6th Cir. 2001) (prison officials who knew of threats against a prisoner but did nothing to protect him could be found deliberately indifferent when he was murdered); Young v. Quinlan, 960 F.2d 351, 363 (3d Cir. 1992) ("prison officials should, at a minimum, investigate each allegation of violence or threat of violence").

The SAC also states a viable Eighth Amendment claim against defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia since it alleges that those defendants instituted policies or conditions that created excessive risks of danger to all prisoners, and that led to plaintiffs' decedent's death.  First, the SAC alleges that these defendants placed plaintiffs' decedent in a situation of danger by classifying Rodriguez – who was known to be extremely violent and aggressive – as medium security and by housing him in a dormitory setting.  See Hearns v. Terhune, 413 F.3d 1036, 1041 (9th Cir. 2005) (allegation that prison officials knew, but did nothing, about a group of Muslim prisoners who assaulted those who questioned their authority stated a deliberate indifference claim); Brown, 398 F.3d at 915 ("a deliberate indifference claim may be predicated on custodial officers' knowledge that a specific individual poses a heightened risk of assault to even a large class of detainees"); Cottone v. Jenne, 326 F.3d 1352, 1358-59 (11th Cir. 2003) (prison staff's failure to monitor prisoner with record of "violent, schizophrenic outbursts" stated a deliberate indifference claim); Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1029-30 (11th Cir. 2001) (en banc) (lack of classification and separation of violent prisoners supported a deliberate indifference claim); Janes v. Hernandez, 215 F.3d 541, 542-43 (5th Cir. 2000) (policy of mixing nonviolent prisoners with violent ones could support county liability for assault); Saunders v. Chatham Cnty. Bd. of Comm'rs, 728 F.2d 1367, 1368 (11th Cir. 1984) (deliberate indifference established where prison staff failed to segregate an inmate who displayed a "violent pattern of behavior"); Horton v. Cockrell, 70 F.3d 397, 401 (5th Cir. 1995) (prisoner who had assaulted multiple other prisoners presented an obvious risk); see, e.g., Winton v. Bd. of Comm'rs of Tula Cnty, Okla., 88 F. Supp. 2d 1247, 1266 n.13 (N.Okla. 2000) (noting evidence that violent offenders should be kept in cells rather than open dormitories); Smith v. Arkansas Dep't of Corr., 103 F.3d 637, 644-45 (8th Cir. 1996) (noting dangers of open

barracks); Ruiz v. Estelle, 503 F. Supp. 1265, 1282 (S.D.Tex. 1980) (noting dangers of dormitories), aff'd in pertinent part, 679 F.2d 1115 (5th Cir. 1982).

The SAC further states an Eighth Amendment claim against defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia by alleging that they were directly responsible for G-dorm being overcrowded and inadequately staffed – conditions which exacerbated tensions among the prisoners and precipitated a far greater number of violent incidents among the prisoner population.  Indeed, "evidence ... of persistent overcrowding, failure to classify, [and] excessive reliance on dormitory housing and inadequate staffing, in the face of clear warnings that such conditions [are] exacerbating violence ... provides sufficient evidence of deliberate indifference on the part of the defendants." Fisher v. Koehler, 692 F.Supp. 1519, 1562 (S.D.N.Y. 1988) (citing Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977)); Hart v. Sheahan, 396 F.3d 887, 894 (7th Cir. 2005) (inadequate staffing states a constitutional claim because it "subject[s] [inmates] to a risk of serious harm by an unreasonably protracted detention of them out of sight and hearing of guards"); Krein v. Norris, 309 F.3d 487, 489-91 (8th Cir. 2002) (evidence that officials provided only one guard for three barracks housing 150 inmates supported an Eighth Amendment claim); Lawrence v. Norris, 307 F.3d 745, 747 (8th Cir. 2002) (prisoner who was attacked at a time when there was only one guard on duty stated an Eighth Amendment claim); Saunders, 728 F.2d at 1368 (deliberate indifference established where "the jail facilities were understaffed and with inadequate personnel to monitor inmate activity," and where "the particular pod of the jail in which plaintiff was lodged was understaffed on the occasion when he was injured"); Laube v. Haley, 234 F. Supp. 2d 1227, 1244-46 (M.D.Ala. 2002) ("the combination of substantial overcrowding and significantly inadequate supervision in open dorms" violates the Eight Amendment right to protection from violence).

And, the SAC alleges that defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia also failed to implement any security measures and/or precautions to detect and eliminate weapons and contraband (such as the shank used to kill Velez) from inmates' cubes, belongings and persons, and from common areas, and thereby created an environment where weapons – such as the nine-and-a-half-inch shank that was used to kill plaintiffs' decedent – could be concealed, possessed, maintained, and wielded by inmates without fear of detection, or if detected, without fear of disciplinary action.  This failure created a pervasive risk of harm to the inmates on G-dorm.  See Marsh, 268 F.3d at 1029 ("Conditions like those in this case, where violent prisoners are allowed free reign of a jail with easy access to weapons without proper supervision by guards could be found to have caused the assaults on Plaintiffs"); Berry v. City of Muskogee, 900 F.2d 1489, 1498 (10th Cir. 1990) (failure to maintain control of wire brooms); Shrader v. White, 761 F.2d 975, 982 (4th Cir. 1985) (failure to curb manufacture of weapons from scrap metal); Tillery v. Owens, 719 F. Supp. 1256, 1276 (W.D.Pa. 1989) (failure to search inmates leaving industry area).  The allegations that these defendants were responsible for policies – regarding weapons and regarding staffing – suffices to state a claim against these defendants.  See Redman v. Cnty of San Diego, 942 F.2d 1435, 1446-47 (9th Cir. 1991) (en banc) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy "itself is a repudiation of constitutional rights and is the moving force of the constitutional violation") (citations and internal quotation marks omitted), abrogated on other grounds by Farmer, 511 U.S. at 825.

Perhaps realizing as much, defendants assert that "if the first cause of action alleges an Eighth Amendment failure-to-protect ... claim, the claim is ... duplicative of the Eighth Amendment failure-to-intervene claim in the third cause of action, and should ... be dismissed"

13

(DM at 4).  This contention is frivolous.  "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.   An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that any constitutional violation has been committed by a law enforcement official.  Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).  And, the direct participation claims and failure to intervene claims can be pleaded in the alternative.  Lanorith v. Truscelli, 2017 WL 3634600, at *13 (E.D.N.Y. Aug. 22, 2017); Guerrero v. City of N.Y., 2017 WL 2271467, at *4 (S.D.N.Y. May 23, 2017); Buchy v. City of White Plains, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015).

Nor is there merit to defendants' contention that the claims against all defendants other than Bailey and Piersall must be dismissed because the SAC fails to allege their personal involvement in any constitutional violation (DM at 9-14).  Imposition of liability under 42 U.S.C. § 1983 requires a defendant's personal involvement in the alleged constitutional violation.  See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  A defendant may be "personally involved" in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 if he: (1) participated directly in the constitutional violation; (2) failed to remedy the wrong after being informed of the violation; (3) created, or allowed the continuance of, a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5), through deliberate indifference, failed to

act on information that unconstitutional acts were occurring.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Hamilton v. Fischer, 2013 WL 3784153, at *5 (W.D.N.Y. July 18, 2013).

As set forth above, the allegations in the SAC amply satisfy these standards, especially when all well-pleaded factual allegations in the complaint are taken as true, and all reasonable inferences are drawn in favor of plaintiffs, as they must be.  Chase Group Alliance LLC, 620 F.3d at 150.  Nevertheless, defendants contend that the claims against the defendants Connell, Naughton, Bell, Klein, Ciaccia, and Frey – who defendants denominate as the "supervisory defendants" (DM at 10) – must be dismissed because the SAC does not allege that these defendants "were present and had the opportunity to intervene or protect plaintiff from the fatal assault" (DM at 10).  To begin, the SAC alleges that Ciaccia and Frey were among those officers who stood by and did nothing as they witnessed Rodriguez assault Velez over the course of several hours in a dormitory that was under those defendants' control (SAC at ¶¶ 56-57, 63, 66, 71, 85).  In any event, a defendant acting in a supervisory capacity need not have personal knowledge of a particular constitutional violation to be liable under Section 1983, if he was indirectly responsible for the violation or could have prevented the unconstitutional conduct. Scott v. Fisher, 616 F.3d 100, 110 (2d Cir. 2010) ("the personal involvement of a supervisory defendant may be shown by evidence that ... the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom"); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010); Sash v. U.S., 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009); Dawkins v. Gonyea, 646 F.Supp.2d 594, 604-05 (S.D.N.Y. 2009); 5 Borough Pawn, LLC v. City of New York, 640 F.Supp.2d 268, 296 (S.D.N.Y. 2009); see also Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir. 1989); Harper v. Lawrence County, Ala., 592 F.3d 1227, 1237 (11th Cir. 2010) ("Supervisory liability lies where the

defendant personally participates in the unconstitutional conduct or there is a causal connection between such conduct and the defendant's actions").

Here, the SAC amply alleges that defendants Connell, Naughton, Bell, Klein, Ciaccia, and Frey directed that G-Dorm be used to house inmates in a dormitory setting despite knowing that doing so would precipitate a far greater number of violent incidents among the prisoner population (SAC at ¶ 86), that they directed that G-Dorm house more inmates than it could physically handle (id. at ¶ 87), and that G-Dorm be understaffed (id. at ¶¶ 88-90).  The SAC also alleges that these defendants were responsible for failing to implement any security measures designed to detect and eliminate weapons, such as the shank used to kill Velez, from G-Dorm, and thereby created an environment where weapons could be concealed, possessed, maintained, and wielded by inmates without fear of detection, or if detected, without fear of disciplinary action (Id. at ¶ 92).  And, the SAC alleges that, prior to April 24, 2009, defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia were each aware that Rodriguez was an extremely violent felon who was incarcerated for attempting to murder three individuals, two of whom were police officers, and for illegally possessing a loaded handgun, that he had vicious and violent propensities, and that he had amassed a substantial disciplinary history while incarcerated, including multiple incidents of violent conduct and fighting, multiple incidents of weapon possession, at least one previous assault on an inmate, over twenty Tier II infractions, and over ten Tier III infractions.   Despite knowing the serious safety risk Rodriguez posed to the inmate population, defendants Connell, Naughton, Bell, Frey, Klein, and Ciaccia made the decision to classify Rodriguez as medium security and to house him in G-Dorm (Id. at ¶¶ 94-97). These allegations are more than sufficient at the pleading stage to state a cause of action against the supervisory defendants.

Equally unavailing is defendants' assertion that the SAC contains no allegations "regarding the specific conduct" of defendants Andre, Sansevieri, Avery, and Theall, and therefore that the claims against them must be dismissed (DM at 12).  In fact, the SAC specifically alleges that these defendants were all correction officers who were "present at various times on the dorm during the confrontation between Rodriguez and Velez," that they observed and overheard the interaction between the two men, but that they deliberately took no steps to quell the violence and protect Velez's safety (SAC at ¶¶ 71-85).  Moreover, defendants' reliance on <u>Brown v. Artus</u>, 647 F. Supp. 2d 190 (N.D.N.Y. 2009) (DM at 13) is misplaced, since that case was a decision on a summary judgment motion supported by a full evidentiary record, not a Rule 12(b)(6) motion based solely on the pleadings.

For the same reason, defendants' claim that the claims against defendants Bolen, McNeil, Gatley, Ciaccia, and Frey should be dismissed on personal involvement grounds is baseless (DM at 13-14).  Preliminarily, and as set forth above, defendants Ciaccia and Frey are alleged not only to have been among those officers who stood by and did nothing as they witnessed Rodriguez assault Velez over the course of several hours in the dormitory, but they are also alleged to be among the supervisory defendants responsible for the overcrowding and understaffing of G-Dorm, the use of a dormitory housing system there, the woefully deficient weapons policy there, and the decision to classify Rodriguez as medium security and house him in G-Dorm despite the known safety risk he posed to the inmate population there.  Next, the SAC alleges that all of these defendants were present during, and witnessed, the protracted altercation between Rodriguez and Velez, but that none of them took any steps at any point to defuse the situation (SAC at ¶¶ 56-57, 62-64, 67-85).

Accordingly, defendants' motion to dismiss the first, second, and third causes of action should be denied.

**POINT II**

**THE HALL AND COX PLAINTIFFS' CLAIMS ARE ACTIONABLE, AND THERE IS NO BASIS TO DISMISS THE FOURTH, FIFTH, SIXTH, SEVENTH, EIGHTH, AND NINTH CAUSES OF ACTION (Responding to Defendants' Memorandum, Points II and III)[4]**

Defendants argue first that plaintiffs' first cause of action "fails to state a claim upon which relief may be granted" (Defendants' Memorandum of Law ("DM") at 3).

Frederick and Shamia Hall's individual causes of action for violation of their due process rights in being deprived of their relationship with their father (plaintiffs' decedent died when his son Frederick Hall and his daughter Shamia Hall were still minors)[5] and Christine Cox's claims – through her estate – for being deprived of her relationship with her son, are constitutionally sound. See Greene v. New York, 675 F.Supp 110, 114 (S.D.N.Y. 1987):

> "Furthermore, Latisha and Lisa Greene's [the plaintiffs' decedent's children] claims are strongly supported by the decisions of a number of other circuit courts: those circuits which have considered the question have concluded that there is a § 1983 claim for deprivation of the parent-child relationship in the wrongful death context. See Bell v. City of Milwaukee, 746 F.2d 1205 (7th Cir. 1984) (father may recover under § 1983 for deprivation of constitutional interest where police officers shot and killed son ); Kelson v. City of Springfield, 767 F.2d 651 (9th Cir. 1985) (parents may bring § 1983 action for deprivation of liberty interest in the society of their son where school failed to prevent son from committing suicide); Smith v. City of Fontana, 818 F.2d

---

[4]   With respect to defendants' argument that the Cox and Hall plaintiffs' claims should be dismissed because the SAC does not allege defendants' personal involvement in those constitutional violations (DM at Point IV, pp. 9-14), plaintiffs incorporate their arguments from Point I here.

[5]   "While the clearest instance of the right to familial association is embodied in the decades' worth of authority protecting parents' custodial rights … courts have not held, and defendants do not argue, that the constitutional protection for such relationships end when a child turns 18." Patel v. Searles, 305 F.3d 130, 139 (2d Cir. 2002) (internal citation omitted).

1411 (9th Cir. 1987) (children may bring § 1983 action for deprivation of father's companionship where police officers killed father during arrest); Trujillo v. Bd. of Cnty Comm'rs, 768 F.2d 1186 (10th Cir. 1985) (mother and sister have constitutionally protected interest in relationship with son and brother); Estate of Bailey by Oare v. Cnty of York, 768 F.2d 503, 509 n. 7 (3d Cir. 1985) (adopting the holding of Bell that a parent whose child has died as a result of unlawful state action may maintain an action under § 1983 for deprivation of liberty); Mattis v. Schnarr, 502 F.2d 588 (8th Cir. 1974) (father whose son is shot by police officer has standing to sue under § 1983 and states a claim for deprivation of parenthood without due process of law); cf. Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985) (without discussing constitutional issues, court upholds jury verdict in § 1983 action awarding $ 200,000 to father whose son was shot by police officers); Logan v. Hollier, 711 F.2d 690 (5th Cir. 1983) (remanding to district court question whether plaintiff whose daughter was killed by police officers has a cognizable claim under § 1983)."

Indeed, it is well established that a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and that "the state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ] 1983." Kelson v. City of Springfield, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing Santosky v. Kramer, 455 U.S. 745, 753 (1982)). "This constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987), rev'd on other grounds by Hodgers-Durgin v. De La Vina, 199 F.3d 1037 (9th Cir. 1999).  Moreover, the Constitution "protects those relationships, including family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." Board of Dir. v. Rotary Club, 481 U.S. 537, 545 (1987) (internal quotation marks and citation omitted); see also Conti v. City of Fremont, 919 F.2d 1385, 1388-89 (9th Cir. 1990).

Defendants, however, argue that the claims asserted by Fred Velez's mother and children are "not actionable" because defendants actions (or inactions) did not "purposefully target[ ] the family relationship" (DM at 6). This argument does not withstand scrutiny. Despite certain District Court rulings to the contrary, no "rule" exists requiring that state action be directed at the familial relationship in order for there to be a valid due process claim. See Patel v. Searles, 305 F.3d 130, 137 (2d Cir. 2002) ("The officers' next argument – that there was no constitutional violation because the officers' actions were not 'directed at' Patel's family relationships – fares no better. First, this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association"). It is also disingenuous to suggest that a prison official would not realize, as an obvious matter, that the inmates in their care and custody – whose lives they are constitutionally duty-bound to protect – often have children and parents who they love, and indeed that these most intimate of relationships may well be the most important things in those people's lives. Defendants' deliberately indifferent failure to protect plaintiffs' decedent from lethal violence is inherently directed at his familial relationships. See Lee v. City of L.A., 250 F.3d 668, 685-86 (9th Cir. 2001).

As set forth above, the SAC adequately alleges that the defendants' actions, omissions, and policies were a direct and legal cause of Fred Velez's death. Assuming the truth of these allegations, as this Court must, plaintiffs have adequately alleged that defendants' actions, omissions, policies, and practices constituted an "unwarranted interference" with plaintiff Cox's constitutionally-protected right under the Fourteenth Amendment to the association, companionship and society with her son, and with the Hall plaintiffs' constitutionally-protected right to association, companionship and society with their father. For these reasons, the Court

should deny defendants' motion to dismiss the claims asserted by plaintiffs' decedent's children and mother.[6]

## **CONCLUSION**

For the foregoing reasons, this Court should deny defendants' motion to dismiss pursuant to Rule 12(b)(6) in its entirety.

Dated:          Mineola, New York
                December 29, 2017

                                        Respectfully submitted,

                                         /s/ Ameer Benno
                                        Ameer Benno
                                        FINZ & FINZ, P.C.
                                        410 East Jericho Turnpike
                                        Mineola, NY 11501
                                        Tel.:  (516) 433-3000

                                        Jeffrey Rothman, Esq.
                                        THE LAW OFFICE OF JEFFREY A. ROTHMAN
                                        315 Broadway, Suite 200
                                        New York, NY 10007
                                        Tel.: (212) 227-2980

                                        Attorneys for Plaintiffs

---

[6] As noted in Point I, <u>supra</u>, direct participation claims and failure to intervene claims can be pleaded in the alternative.  Thus, defendants' challenge to the SAC's sixth and ninth causes of action, which assert claims for the deprivation of the Cox and Hall plaintiffs' Fourteenth Amendment rights under a failure to intervene theory, must be rejected (DM at Point III, pp. 8-9).

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2017, I served a true copy of the annexed **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE** upon the OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL through the district court's CM/ECF system, which caused the following parties and counsel to be served by electronic means, as reflected on the Notice of Electronic Filing generated by the ECF system:

Eric T. Schneiderman
NYS ATTORNEY GENERAL
The Capitol
Albany, NY 12224-0341
Attn: Christopher J. Hummel, AAG
Email: Christopher.hummel@ag.ny.gov

December 29, 2017     /s/ Ameer Benno
                          Ameer Benno, Esq.