UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SHIKEMA WILLIAMS, administratrix of the estate of FREDERICK VELEZ, SHIKEMA WILLIAMS, administratrix of the estate of CHRISTINE COX, FREDERICK HALL, and SHAMIA HALL,

Plaintiffs,

v. 6:17-CV-750 (TJM/ATB)

SUPERINTENDENT SUSAN CONNELL, DEPUTY SUPERINTENDENT PETER NAUGHTON, SGT. RALPH CIACCIA, C.O. THEODORE ELLIOT, C.O. ALAN ANDRE, C.O. LESLIE BAILEY, C.O. DAVID PIERSALL, C.O. MICHAEL BOLEN, C.O. VINCENT SANSEVIERI, C.O. K. KLEIN, C.O. J. MCNEIL, C.O. B. FREY, C.O. GATLEY, C.O. AVERY, CAPT. EARL BELL, C.O. THEALL, AND "JOHN DOES" 1-15 (names being fictitious and presently unknown),

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THOMAS J. McAVOY**
**Senior United States District Judge**

## DECISION and ORDER

Before the Court is Defendants' motion to dismiss Plaintiffs' Second Amended Complaint in this matter involving the death of Frederick Velez ("Decedent") while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). See dkt. # 58. The parties have briefed the motion and the Court has determined to decide the matter without oral argument.

## I. BACKGROUND

This case concerns the death of Frederick Velez on April 25, 2009 after he was

stabbed by another inmate at the Oneida (New York) Correctional Facility the previous evening. Second Amended Complaint ("Complt."), dkt. # 54, at ¶ 110. Plaintiffs generally allege that Velez's death was a result of Defendants' deliberate indifference to the dangers Velez faced while incaracerated. They seek damages for Defendants' alleged constitutional violations both on behalf of Decedent's estate and on behalf of his survivors. Plaintiffs contend that Defendants' conduct violated these persons' constitutional right to a relationship with the decedent.

Plaintiffs' Second Amended Complaint alleges that on April 24, 2009, Decedent "was playing checkers or dominoes" with another inmate, Jose Rodriguez, "in the dayroom of G-Dorm in Building 21 of the Oneida Correctional Facility, a medium-security prison." Id. at ¶ 40. Jose Rodriguez, Plaintiffs allege, "was known to defendants to have vicious and violent propensities[.]" Id. at ¶ 49. On the date in question, he was in the twenty-seventh year of twenty-to-life-year sentence for killing a police officer. Id. Defendants knew this history. Id. Plaintiffs also allege that Defendants knew Rodriguez had "a history of violent and aggressive behavior and vicious and violent propensities[.]" Id. at ¶ 50. They also knew he had a "history of violent assaults," and that while incarcerated Rodriguez's disciplinary record demonstrated "mounting incidents of violence and fighting," in addition to possession of weapons and "at least one previous assault on another inmate." Id. ¶¶ 50-51. Though they knew Rodriguez was dangerous, Defendants allegedly "failed to segregate him from the general inmate population" or place him in the psychiatric ward. Id. at ¶ 52. Defendants instead kept Rodriguez among the general population. Id. at ¶ 53.

Plaintiffs allege that an argument between Rodriguez and the Decedent eventually

broke out over the game of dominoes. Id. at ¶ 54. Rodriguez accused Decedent of cheating, which he denied. Id. The two men allegedly shouted and cursed at each other "for an extended period of time." Id. at ¶ 55. Plaintiffs allege that the Defendant prison guards heard this commotion and did nothing "to defuse the situation." Id. at ¶ 56. Indeed, Plaintiffs contend, the Defendant prison guards did not even make their rounds that night. Id. at ¶ 57. This failing, Plaintiffs contend, amounted to "deliberate indifference to the well-being and safety of the inmates under their charge[.]" Id.

According to Plaintiffs' Second Amended Complaint, the disagreement between Decedent and Rodriguez at some point "turned physical." Id. at ¶ 59. That physical altercation allegedly continued "for an extended period or time . . . and . . . created an enormous commotion in the recreation room[.]" Id. at ¶ 60. Many inmates gathered around the action. Id. The two men's argument continued for two hours, Plaintiffs allege, between 8:00 and 10:00 p.m. Id. at ¶ 61. Plaintiffs allege that "[a]ll of this activity occurred within earshot and view . . . and in the presence of . . . the corrections staff on G-Dorm[.]" Id. at ¶ 62. That staff allegedly "did not respond to the incident, make any effort to break up the fight, maintain order, or separate" the antagonists. Id. at ¶ 64. Officers also allegedly failed to take any measures to protect "the security and welfare of the inmates, including . . . decedent." Id.

Plaintiffs allege that other inmates broke up the fight between the two men, and Decedent "retreated to his assigned cubicle in" the dorm. Id. at ¶ 65. Decedent stayed in that room, even though Rodriguez allegedly "pursued" him, "taunting him and threatening him with extreme physical violence." Id. Despite the fact that the Defendant guards could see and hear the incident, Plaintiffs claim, no Defendant made any effort "to break up the

fight, maintain order, separate" the two men, "or protect the security and welfare of the inmates[.]" Id. at ¶ 66.

For the next one to two hours, Plaintiffs allege, Rodriguez paced in front of Defendant's cube holding "a long shank in his hand, waving it about conspicuously" and "taunting" decedent. Id. at ¶ 67. Rodriguez allegedly cursed at Decedent, threw objects and furniture at him, and shouted violent threats at him. Id. The shank Rodriguez supposedly possessed was nine-and-one-half inches long and a half-inch wide. Id. at ¶ 68. One end had been sharpened to a point and the other end wrapped in tape, creating a handle. Id. Rodriguez allegedly waived the shank at Decedent and threatened to use the weapon to kill him. Id. at ¶ 69. Decedent did not respond, remaining in his cube. Plaintiffs allege that Rodriguez's conduct and threats were visible and audible to Defendants, or should have been. Id. at ¶ 70. Despite this, Defendants allegedly did nothing about the situation. Id. at ¶ 71. Plaintiffs also allege that Defendants did not respond when Rodriguez defecated in a plastic container in the hallway near Decedent's cube and then threw feces at Decendant. Id. at ¶¶ 72-73. Decedent eventually used a mop in an attempt to clean the feces from inside his cube. Id. at ¶ 74. Plaintiffs allege that Rodriguez attacked Decedent when he stepped outside the cube to rinse off the mop. Id. at ¶ 74. Defendants allegedly again failed to respond to this situation. Id. at ¶ 75.

Plaintiffs allege that Rodriguez then took a chair from the rec room and threw it at Decedent; again the Defendant guards did nothing. Id. at ¶¶ 76-77. Rodriguez then allegedly began to beat Decedent again, "punching him repeatedly," with no response from the guards. Id. at ¶¶ 78-79. Rodriguez then threw the chair at Decedent again. Id. at ¶ 80. Despite the noise that action generated, Plaintiffs allege that the guards did

nothing about the situation. Id. at ¶¶ 80-81. Finally, Plaintiffs allege, Rodriguez assaulted Decedent again. Id. at ¶ 82. "During an extremely prolonged and violent and noisy physical altercation, Rodriguez stabbed [Decedent] in the chest with the shank," leading to Decedent's demise. Id. at ¶ 83.

Plaintiffs initially filed a Complaint in the Kings County, New York, Supreme Court. See dkt. # 1. Defendants removed the case to the United States District Court for the Eastern District of New York on July 19, 2012. See Id. The Eastern District Court granted Defendants' motion to transfer venue to this Court and denied Plaintiffs' motion to remand on June 29, 2017. See dkt. # 38. The Court then permitted Plaintiffs to file a Second Amended Complaint, which they did on October 25, 2017. See dkt. # 54. The Second Amended Complaint raises nine counts, all brought pursuant to 42 U.S.C. § 1983. While raised on behalf of various parties, all of the counts point to injuries caused by Defendants' conduct in failing to prevent the attack that killed Frederick Velez. Counts 1, 2 and 3 are raised on behalf of the estate of Frederick Velez. Count 1 alleges a violation of Velez's Eighth and Fourteenth Amendment rights due to Defendants' failure to protect Velez from Rodriguez's attack. Count 2 alleges supervisory liability against prison officials for creating and enforcing policies and ratifying actions that led to Velez's death. Count 3 accuses prison guards of failing to intervene and stop the attack on Velez. Count 4, 5, and 6 allege violations of the constitutional rights of Christine Cox, the deceased mother of Frederick Velez. Count 4 alleges that Defendants' violation of Velez's constitutional rights led to a violation of Cox's constitutional right to a parent-child relationship and therefore depriving her of her "Constitutional rights to intimate association, companionship and society." Comptl. at ¶ 145. Count 5 alleges that the prison supervisors' violation of

Velez's constitutional rights deprived Cox of her relationship with her son and thus her right to association with him. Count 6 makes the same allegation on Cox's behavior against the prison guards. Counts 7, 8, and 9 are brought on behalf of Decedent's children, Frederick Hall and Shamia Hall. They raise similar claims to those in Counts 4-6, but this time on the basis that Defendants' actions deprived them of the intimate association provided by a parent-child relationship.

Defendants then filed the instant motion to dismiss, and the parties briefed the issues, bringing the case to its present posture.

## II. LEGAL STANDARD

Defendants have filed a motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants argue Plaintiff has not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true. In addressing such motions, the court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Holmes v. Grubman, 568 F.3d 329,335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662,678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. V. Twombly, 550 U.S. 544,570 (2007)).

## III. DISCUSSION

Defendants seek dismissal on several grounds. As a general matter, Defendants'

motion can be divided into two categories: (1) a motion to dismiss the substantive claims brought on behalf of the estate of Frederick Velez; and (2) a motion to dismiss the claims of certain parties because they cannot be asserted on their behalf. The Court will first address the claims brought on behalf of the Velez estate, and then address whether the individual plaintiffs not representing the estate are entitled to raise their claims.

**A. Claims on Behalf of the Velez Estate**

The claims on behalf of the Velez Estate all center on the incident that led to his death and the actions of prison officials when confronted with the violent conflict that appeared to be developing between Velez and Rodriguez. Defendants seek to dismiss the counts related to this conduct on several grounds. They first argue that Count 1 of Plaintiffs' Second Amended Complaint must be dismissed. They contend that the nature of the claim is unclear; Plaintiffs allege that the decedent was deprived of life without due process and that Defendants engaged in conscience-shocking behavior–which suggests a Fourteenth Amendment substantive due process claim–but they also allege conduct which could be interpreted as an Eight Amendment failure-to-protect or failure-to-intervene claim. Whatever the claim, Defendants contend, Plaintiffs have failed to allege sufficient facts to make their right to relief plausible.

Plaintiffs' response goes some way towards clarifying the action, which is not a model of clarity. Plaintiffs argue that they have alleged facts sufficient to make out Eighth Amendment claims on Counts 1, 2, and 3. They do not argue that they have attempted to raise a substantive due process claim, and the Court will therefore address Defendants' arguments only with respect to the Plaintiffs' Eighth-Amendment allegations, and with

respect to the various Defendants charged with violating Defendants' rights in this respect.[1] Because of the nature of the Plaintiffs' arguments and the nature of their pleading, the Court will address Plaintiffs' Eighth Amendment claims as a whole, and with reference to the two groups of Defendants here named, prison guards and prison supervisors and officials.

**i. Eighth Amendment Failure-to-Protect and Failure-to-Intervene Claims**

"'When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.'" Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (quoting Helling v. McKinney, 509 U.S. 25, 32 (1993)). "[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corrections, 842 F.2d 27, 30 (2d Cir. 1988). As such, "[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 620 (2d Cir. 1996). "Where a prison inmate has alleged that he was not protected by prison officials, . . . 'an inmate who is injured as a result of a prison official's deliberate indifference to his

[1]Plaintiffs appear to agree that they cannot raise a Fourteenth Amendment substantive due process claim based on this conduct, since their claims are covered by the Eighth Amendment, a more specific right. The Court will therefore grant the motion to the extent that Defendants seek dismissal of any Fourteenth Amendment substantive due process claims. See Velez v. Levy, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").

safety may maintain a damage action for the deprivation of his civil rights[.]'" Snider v. Dylag, 188 F.3d 51, 54 (2d Cir. 1999) (quoting Stubbs v. Dudley, 849 F.2d 83, 86 (2d Cir. 1988)). To demonstrate the requisite "deliberate indifference," a prisoner-plaintiff must show that "a prison official acted with 'deliberate indifference' to prisoners' health or safety." Blyden, 186 F.3d at 262. Plaintiff need not show "'that a prison official failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" Id. (quoting Farmer, 511 U.S. at 842). A prisoner could also prevail on a claim that a defendant failed to intervene to protect him from an assault by another prisoner. Morales, 842 F.2d at 30. "Inaction by a corrections officer to intercede and halt an attack by a fellow prisoner is sufficient basis for deliberate indifference." Dizak v. Hawks, No. 15cv1171, 2015 U.S. Dist. LEXIS 176283, at *12 (N.D.N.Y. Dec. 9, 2015).

As a general matter, Plaintiffs have alleged facts sufficient to state a plausible Eight-Amendment claim based on the circumstances of Decedent's passing. As explained above, Plaintiffs allege that guards were aware of a conflict between Decedent and Rodriguez, that they were aware that Rodriguez had a history of violence, that he had the weapon that eventually killed Decedent, that they knew that Rodriguez had been pacing in front of Decedent's cubicle and threatening him, and they knew that Rodriguez would likely attack Decedent at some point. Despite this knowledge, guards did nothing to prevent the attack. Such allegations, if proved true, would be sufficient for a jury to conclude that the Defendant guards acted with deliberate indifference to a serious threat to Decedent's health and safety. Defendants' argument is less that Plaintiffs have failed to allege culpable conduct and more that they have failed to implicate particular Defendants in that

conduct. The Court will address these claims about particular Defendants in turn.

**ii. Prison Officials**

Defendants first seek to dismiss claims of supervisory liability against Defendants Susan Connell, Peter Naughton, Earl Bell, K. Klein, Ralph Ciaccia, and B. Frey. Defendants claim that Plaintiffs have not plead any facts making it plausible that these Defendants had any personal involvement in designing or implementing the policies that injured Decedent. Plaintiffs respond that they have alleged supervisory liability against these officials because they have alleged that the Defendant supervisors classified Rodriguez as medium security and housed him in a dormitory even though they knew he was extremely violent and aggressive. Further, Plaintiffs contend that the Second Amended Complaint alleges that the supervisory defendants caused the G-dorm to be overcrowded and inadequately staffed, causing the conflict that led to Decedent's demise. They also allege that Defendants failed to establish and implement policies to detect and eliminate weapons like the one used to kill Decedent.

In actions of this sort, "liability for supervisory government officials cannot be premised on a theory of *respondeat superior* because § 1983 requires individual, personalized liability on the part of each government defendant." Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014). A plaintiff must introduce "[e]vidence of a supervisory official's 'personal involvement' in the challenged conduct." Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003) (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)). Personal involvement can include "direct participation by the supervisor in the challenged conduct." Id. Personal involvement by a supervisor can

"also be established by evidence of an official's (1) failure to take correct action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Id. In other words, to prevail on a claim against a supervisory officer, a Plaintiff must show that his injuries were a result of some action by the Defendant, whether in supervising or in crafting policies.

Plaintiffs' Second Amended Complaint offers the following allegations concerning the policies and practices employed at the Oneida facility:

> 38. Defendants, intentionally, with deliberate indifference, gross negligence, and/or reckless disregard for the safety, security, and constitutional and statutory rights of plaintiffs' decedent, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies or practices of, among other things:
>
> a. Subjecting persons in their correctional facility to violence perpetrated by other inmates.
>
> b. Selecting, retaining and assigning correction officers, deputies, civilian personnel and civilian volunteers to their correctional facility who exhibit deliberate indifference and reckless disregard for the safety, security and constitutional and statutory rights of inmates;
>
> c. Failing to take adequate security measures to protect inmates from unnecessary harm, including but not limited to, the following:
>
> 1. Separation of inmates from potentially violent or dangerous inmates; use of security cameras and audio monitors to monitor inmate activity and violence within and without prison dormitories, cubes, and other locations;
>
> 2. Having in place minimally responsible mechanisms to prevent the presence and/or use of dangerous instrumentalities as weapons within the prison;
>
> 3. Training deputies, civilian personnel and civilian volunteers to monitor inmates and immediately respond to acts of violence, or threats of violence;
>
> 4. Monitoring inmates who, for whatever reason, are unable to care for themselves; and
>
> 5 Recognizing potentially volatile situations [and] circumstances that are likely to erupt into violence;

d. Failing to ensure adequate staffing to ensure that Constitutional violations do not occur;

e. Failing to adequately train, supervise, and control correction officers, deputies, civilian employees or volunteers in law enforcement; Failing to adequately, properly, and regularly search facility spaces, including but not limited to:

   1. Area searches;
   2. Block searches of inmate dormitories, day rooms and other living quarters;
   3. Cube searches;
   4. Security inspections;

f. Failing to adequately discipline correction officers, deputies or civilian employees involved in misconduct;

g. Condoning and encouraging correction officers, deputies and civilian employees in the belief that they can violate the rights of persons such as plaintiffs' decedent in this action with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

Complt. at ¶ 38. These allegations are sufficient to make plausible a right to relief based on the policies and practices created by, approved of, or permitted by supervisors. Even setting aside any allegations that supervisors were aware that prison guards were ignoring Rodriguez's threats to and attacks on the Decedent, the failings detailed above explain how a person like Rodriguez–who Plaintiffs allege presented a credible threat to other inmates–could be housed with Decedent, be subject to lax supervision, and have access to the weapon that he used to kill the Decedent. As general allegations, they state a claim for supervisory liability.

Defendants argue that these allegations are conclusory and do not explain how the particular policies led to Velez's death. The Court finds that the allegations in the Second Amended Complaint, read as a whole, are sufficient to make plausible that Defendants' alleged policies, particularly those designed to deal with violence-prone inmates, weapons, and supervision in the dormitory areas, caused Velez's death at the hands of an inmate

known to be violent who was permitted to remain in a lightly supervised dormitory setting and have access to weapons.

Defendants also argue that the allegations about the conduct of particular policy-making and supervisory officials are merely conclusory, and fail to identify any Defendants' role in crafting the policies in question. There is appeal in Defendants' position, as every one of the prison official Defendants is described to have had virtually the same role in the events that led to Velez's death and the allegations are quite general. Moreover, the Second Amended Complaint, without pointing to any particular Defendant, alleges that:

> 34. At all times relevant hereto, defendants were responsible for creating, continuing, implementing, and executing policies, practices, procedures, customs and/or protocols related to the appointment, hiring, training, supervision, monitoring, controlling, auditing, disciplining and retention of all correctional personnel at Oneida.
> 35. At all times relevant hereto, defendants were also responsible for creating and promulgating policies, practices, procedures, customs and/or protocols of Oneida and for ensuring that personnel of Oneida obeyed the Constitution and laws of the Unied States and the State of New York.

Compl. at ¶¶ 34-35.

Recognizing that these allegations are vague and do not name a particular policy created by a particular Defendant, the Court will also deny the motion in this respect. The allegations describe the particular title of each Defendant and allege, in the case of the Defendants moving in this respect, that they crafted the policies that injured the particular Defendants. See Compl. at ¶¶ 15 (Connell), 16 (Naughton), 17 (Ciacca), 24 (Klein), 26 (Frey), and 29 (Bell).[2] Plaintiffs also allege that these Defendants "authoriz[ed]

---

[2]For example, Plaintiffs allege that:
15. At all times relevant hereto, defendant SUSAN CONNELL ("CONNELL") was

condon[ed], and ratifi[ed] the acts of co-defendants," conduct which, if proved, would amount to "deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." Hayut, 355 F.3d at 753. Assuming, as the Court must, that these allegations are true, the Court must conclude that Plaintiff has alleged facts sufficient to make it plausible that Defendants had a personal role in the conduct–either in planning or supervising–that caused the Decendent's injuries.

**iii. Prison Guard Defendants**

Defendants argue that Plaintiffs have failed to allege facts sufficient to make plausible the personal involvement of prison-guard Defendants Sansevieri, Andre, Avery, Theall, Bolen, McNeil, Gatley, Elliott, Ciaccia, and Frey in the events that led to Velez's death. These defendants were corrections officers at Oneida during the events in question, but Defendants argue that Plaintiffs have not alleged that they had any particular involvement in them. Defendants deride the allegations in the Second Amended Complaint as "shotgun pleading" that only references these Defendants "generically." They urge the Court to dismiss the Plaintiffs' claims as mere "speculation" about the individual Defendants' involvement in the incident.

Plaintiffs' Complaint alleges that the argument between Rodriguez and Velez that

---

> the Superintendent of Oneida Correctional Facility ("Oneida"), and as such, was a policy maker with respect to Oneida. This defendant was responsible for the creation and enforcement of the policy decisions described herein. She is further responsible because of her authorization, condoning and ratification of the acts of co-defendants and because of her failure to intervene to prevent acts, omissions, conspiracies and other wrongful conduct described herein.

Compl. at ¶ 15. The allegations against the other supervisory officials are nearly identical.

led to Velez's death occurred in the presence of the prison-guard defendants:

> 56. This argument was, or should have been, in the presence of, and could or should have been heard, and was or should have been witnessed, by the corrections officers who were or should have been on that door, including but not limited to defendants BAILEY, PIERSALL, CIACCIA, BOLEN, MCNEIL, GATLEY, FREY, and ELLIOTT, but none of them took any steps to defuse the situation.
>
> 57. Despite the fact that defendants BAILEY, PIERSALL, CIACCIA, BOLEN, MCNEIL, GATLEY, FREY, and ELLIOTT were supposed to make rounds of G-Dorm on the night of the incident, they either did not do so, or they did so, but failed to intercede in the conspicuous, brutal, vicious, and extremely prolonged assault of VELEZ by Rodriguez upon their arrival there, despite having had ample opportunity to do so, and despite the fact that they were aware that their failure to defuse the fight and maintain order in any way possible would lead to the physical injury and death of VELEZ.

Complt. at ¶¶ 56-57. Once the two men began their physical altercation, Plaintiffs allege, the fight "occurred within earshot and view, and in the presence of (or should have been within earshot and view, and in the presence of), the corrections staff on G-Dorm, who were responsible for maintaining order and security in that dorm." Id. at ¶ 62. Throughout the events that led to Rodriguez stabbing Velez, Plaintiffs allege, officers were aware of the dangerous situation and did nothing to intervene. Id. at ¶ 71-85. In the end, Plaintiffs claim:

> 85. Despite having had more than ample opportunity to do so, at no time prior to Rodriguez stabbing Velez with the shank did any of the corrections staff on the dorm, which included without limitation BAILEY, PIERSALL, CIACCIA, BOLEN, MCNEIL, ELLIOTT, ANDRE, SANSEVIERI, GATLEY, AVERY, and THEALL, make any effort to separate the two men, to maintain the security and welfare of the inmates, including VELEZ, to disarm Rodriguez, or to address and neutralize the escalating sitution between the two men, or to ensure VELEZ'S safety or protect his welfare.

Id. at ¶ 85.

The Court will deny the motion in this respect. Here, the question is whether Plaintiffs have alleged facts sufficient to make it plausible that the Prison Guard

Defendants "acted or failed to act despite [their] knowledge of a substantial risk of serious harm.'" Blyden, 186 F.3d at 262. The Court finds these allegations sufficiently detailed to indicate that the moving Defendants were aware that inmate Rodriguez argued with and threatened the decedent, that he continued to do so for a long period of time, and that he eventually obtained a weapon with which he killed the decedent. Despite this alleged knowledge, the guards allegedly did nothing to halt a situation that seemed likely to cause the tragedy that occurred. While discovery will be necessary to determine the particular role of each officer involved, the Court finds that at this stage in the litigation Plaintiffs' allegations are sufficient to state an Eighth Amendment claim against the moving prison guards.

**B. Claims Brought on Behalf of Plaintiffs Other than the Decedent**

Defendants also seek dismissal of the fourth, fifth, sixth, seventh, eighth and ninth causes of action. Those claims allege that Plaintiffs Frederick Hall, Shamia Hall, and Christina Cox suffered a deprivation of their constitutional right to intimate association, companionship, and society because of Decedent's passing. Cox is Decedent's mother and Frederick and Shamia Hall are his children. Defendants argue that a Plaintiff cannot bring a Fourteenth Amendment Section 1983 claim based on a loss of a familial relationship under these circumstances.

The parties here argue about the existence of a constitutionally protected interest in intimate association that would permit the Plaintiffs to bring claims on their own behalf. The Second Circuit Court of Appeals has concluded that "the Constitution in at least some circumstances protects familial relationships from unwarranted government interference." Patel v. Searles, 305 F.3d 130, 135 (2d Cir. 2002) (citing Roberts v. United States

Jaycees, 468 U.S. 609, 617-618 (1984)). The Constitution protects the "freedom of intimate association" because the Court has a "long tradition of affording 'highly personal relationships a substantial measure of sanctuary from unjustified interference by the State.'" Id. (quoting Roberts, 468 U.S. at 618-619); see, e.g., Adler v. Pataki, 185 F.3d 35, 43-44 (2d Cir. 1999) (right of intimate association protects against firing of husband in retaliation for wife's filing a discrimination complaint).

The Court is not persuaded that Plaintiffs have stated a claim in this respect. Plaintiffs' argument is that Defendants, in acting in a way that led to Decedents' death, unjustifiably interfered with their right to intimate association, thus depriving them of a liberty interest. They dispute Defendants' argument that their claims are not actionable because Defendants' conduct was not aimed at disrupting the family relationship and their injuries were only incidental to the actual constitutional violations in this case. Plaintiffs cite to Lee v. City of Los Angeles, 250 F.3d 668, 685-686 (9th Cir. 2001), for the proposition that a defendant's "deliberately indifferent failure to protect plaintiffs' decedent from lethal violence if inherently directed at his familial relationships" is a Fourteenth-Amendment violation. Lee, however, rests on very different facts. In that case, the plaintiff, who was "mentally disabled," was arrested in Los Angeles. Id. at 676. Officials mistakenly identified him as another man who had fled a New York State work-release program. Id. The plaintiff was extradited from California to New York and spent two years in prison until the real offender's capture. Id. "Had defendants at any time compared [plaintiff's] fingerprints or other identifying characteristics with those of [the actual offender], or had defendants in any other way verified the identity of the man they had in custody, [plaintiff] would not have been arrested, extradited, or incarcerated as" the actual

offender. Id. at 667. The 9th Circuit Court found that the plaintiff's mother had made out a claim for an unreasonable interference with her intimate association with her son. Noting that the right to familial association was protected against "'unwarranted state interference,'" the Court found that Defendants, who ignored the mother's repeated attempts to locate her son and engaged in "reckless, intentional, and deliberate acts or omissions," and that such conduct amounted to "'unwarranted interference'" with the mother's right to association. Id. at 686 (quoting Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987)). This case is different. The defendants in Lee ignored the mother's efforts to act on the familial relationship, and her inability to enjoy the familial relationship was a direct result of the Defendant's refusing to act on her efforts to maintain it. Here, Plaintiffs do not allege they had any contact with the Defendants, and they do not allege that they sought out Defendants' assistance in maintaining their intimate associations. Their claim is purely that Defendants' conduct in committing a constitutional tort unrelated to family relationships interfered with that family relationship. The interference of the familial relationship is more a consequence of an action completely separate from the familial relationship, and the Court cannot find that Plaintiff has or could allege that Defendants sought to "interfere" with a family relationship.

Plaintiff's citation to Patel v. Searles is no move availing. In Patel, the court addressed several issues in determining whether Plaintiff could bring a Section 1983 claim for impairment of familial relationships. First, the court found that "the Constitution in at least some circumstances protects familial relationships from unwarranted governmental interference." Patel, 305 F.3d at 135. That right "derives, in part, from a broader constitutional right to . . . intimate association." Id. Next, the court concluded that

plaintiff's allegation of interference with the familial relationships implicated in the case–"those between [plaintiff] and his father, wife, and children— . . . receive the greatest degree of protection because they are among the most intimate of relationships." Id. at 136. The appeals court further concluded that plaintiff had alleged an unconstitutional impairment of his right to intimate association. Id. at 136. Plaintiff had alleged that his intimate relationships had been "impaired by [defendants'] conduct." Id. The complaint offered "several allegations specifically addressing those relationships," including that one defendant "gave [plaintiff's] wife false and defamatory information about him to make her fear for her own and her children's lives." Id. These false allegations were part of a scheme for "creating sufficient hostility within his family in order to elicit false accusations against him." Id. The court emphasized that "[t]his Circuit has never held that a challenged action must be directed at a protected relationship to infringe on the right to intimate association." Id. at 137; see also Adler, 185 F.3d at 45 (husband can bring intimate association claim when he is allegedly fired in retaliation for wife's activities)

Here, Plaintiffs do not allege that any of the conduct that injured their relationship with the Decedent was directed at them. Instead, they argue an injury to their interests as a result of conduct aimed at the Decedent. Plaintiffs' position is that the Defendants caused injury to their intimate relationship by harming the Decedent, and that this gives rise to a distinct claim. They have not alleged, however, that Defendants had any awareness of the potential injury their conduct could cause to them. The conduct that Plaintiffs allege caused a violation their rights all occurred in Defendants' failure to protect, intervene, and supervise at the Oneida prison. None of the Plaintiffs–only the Decedent–were inmates at that prison, and Defendants did not fail in any obligation

towards those Plaintiffs.

This case is like Pizzuto v. County of Nassau, 240 F.Supp.2d 203 (E.D.N.Y. 2002). There, prison guards beat the plaintiffs' decedent while he was sentenced to a 90-day term. Id. at 205. After a series of efforts by prison guards and staff to cover up the incident, decedent collapsed in his cell. Id. at 205. Guards avoided informing the decedent's mother–who had just arrived to visit him–of his condition and prevented her from seeing him. Id. The decedent's mother suspected her son was being transported to a hospital and followed an ambulance from the jail to the hospital. Id. at 206. She and another son determined that the decedent was at the hospital, but guards attempted to prevent the mother from visiting her ailing son. Id. Guards continued to harass the family when they were eventually able to visit the decedent, who after a time died from the injuries he suffered in the beating. Id. at 206-207. After a trial that ended in the conviction of five corrections officers for decedent's murder, decedent's family filed a civil action for damage on their own and decedent's behalf. Id. at 207-208.

The court in Pizzuto confronted the question of whether the family could bring a familial privacy claim under the circumstances. Id. at 208. Decedent's parents alleged that defendants had "deprived them of their Constitutional right to their son's companionship, which they claim[ed] [was] protected under the Fourteenth Amendment as an element of personal liberty." Id. The court summarized the law on the right to family relationships, noting that, in general, "family members have a constitutionally protected right to make certain types of choices free from government interference." Id. The parents' claim "rest[ed] upon the oft-repeated mantra that a parent has a constitutionally protected liberty interest in 'the companionship, care, custody, and

management of his or her children[.]" Id. at 209-210 (quoting Troxel v. Granville, 530 U.S. 57, 66 (2000)). That principle, the court concluded, has generally been involved "only where custodial relations are involved." Id. at 210. After summarizing precedent from other circuit courts on the issue, the Court rejected the notion that the parents had "a liberty interest in the companionship of their son in the circumstances of this case." Id.

The court also rejected the application of Patel to the case. Id. "Patel falls within that category of cases where government agents take actions intended to undermine or interfere with family relationships." Id. As in this case, plaintiffs had argued that *dicta* in Patel stating that "'this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association.'" Id. at 212 (quoting Patel, 305 F.3d at 137). The court rejected that argument, noting that the Patel court had not decided the question of whether the action must be directed at the protected relationship and, before Patel, had addressed such questions to cases involving disruptions in family association protected by the First Amendment rather than the Fourteenth Amendment, as here. Id. In addition, the court noted that "the challenged conduct in Patel involved acts that directly injured, rather than collaterally impacted, plaintiff's relationship with his family." Id. at 213. The court in Pizzuto therefore rejected plaintiffs' intimate association claim, finding that "Patel represents a category of cases that involves intentional and direct government interference with family relationships." Id. Since "no evidence" existed "that the Defendants in this case took acts that purposely and directly affected Plaintiffs' relationship with [decedent]," they found no support for their claim in Patel. Id.

The same situation applies here. As in Pizzuto, plaintiffs' decedent died due to

events that occurred at jail, allegedly due to the conduct of the defendant jail guards and officials. Like the parents in Pizzuto, plaintiffs here seek recovery on the basis that Defendants' conduct deprived them of a relationship with their son/father. In Pizzuto, the defendants' conduct included beating the decedent and then attempting to cover up their crime. Here, the conduct alleged is failing to prevent or intercede in a beating administered by another jail inmate, arguably conduct less directly connected to animus to the decedent. In any case, there are no allegations in this case of any contact between defendants and plaintiffs. Their injuries are a collateral consequence of the violations of the decedent's constitutional rights.[3] This court agrees with the court in Pizzuto that such injuries cannot be the source of an independent constitutional claim.[4] To decide otherwise under these circumstances would be to conclude that every family member of a person killed by state action has a constitutional claim, no matter how remote from the family relationship the conduct of the defendants was.

---

[3]Indeed, if this case were a torts action, the claims and damages asserted by the Plaintiffs would be loss-of-consortium claims. In New York, such claims are "derivative action[s]," which have "no existence separate and distinct from" the claim of the party injured by defendants' conduct. Cody v. Lake George, 177 A.D.2d 921, 923 (3d Dept. 1991). "Both in a literal and legal sense the husband's claim is derived from the injuries sustained by plaintiff." Id.

[4]In a different context, Courts have concluded that "Section 1983 does not recognize a claim on behalf of one person arising from a violation of another person's rights." T.P. ex rel. Patterson v. Elmsford Union Free School Dist., 2012 WL 860367 at *3 (S.D.N.Y. Feb. 27, 2012); see also, TC v. Valley Cent. School Dist., 777 F.Supp.2d 577, 589 (S.D.N.Y. 2011) ("Jurisdiction cannot be invoked solely on the basis of harms to a member of plaintiffs' family."). Plaintiffs in those cases did not attempt to bring an associational claim, and Defendants here have not invoked a standing argument. Still, the Court finds the situation here similar: plaintiffs here allege no knowing effort or reckless conduct aimed at interfering with any rights that defendants knew they possessed. The constitutionally culpable conduct was aimed at the decedent.

Claims 4-9 are raised on behalf of parties other than the Decedent. Because the Court has concluded that plaintiffs may not asset a claim for interference with familial relationships under these circumstances, the motion will be granted with respect to all those claims, which will be dismissed.[5]

## IV. CONCLUSION

In the end, the Court finds that this matter is about whether the Defendants are liable to the Decedent for violating the Eighth Amendment by failing to protect him and for failing to intervene when he was attacked by a fellow inmate. Claims addressing this issue will remain in the case. As such, the Court will GRANT the Defendants' motion to dismiss, dkt. # 58, in part and DENY the motion in part. The motion is GRANTED with respect to Plaintiffs' claims brought pursuant to the 14th Amendment and with respect by any claims brought by the Plaintiffs on their own behalf, rather than on behalf of the Decedent's estate. As such, Count 1 is hereby DISMISSED to the extent that it raises a Fourteenth-Amendment claim. Counts 4-9 of the Second Amended Complaint are also hereby DISMISSED. The motion is DENIED in all other respects.

Dated:July 18, 2018

Thomas J. McAvoy
Senior, U.S. District Judge

IT IS SO ORDERED.

---

[5]Claims 5, 6, 8, and 9 are labeled as "failure to intervene" and "supervisory liability." Such claims sound as 8th Amendment claims, and would be dismissed even if the Court concluded that these Plaintiffs could raise claims based on decedent's death. None of these Plaintiffs were or are prisoners, and could not bring such claims.