**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SHIKEMA WILLIAMS, administratrix of the estate
of FREDERICK VELEZ, et al.,

               Plaintiffs,

     -v-

SUPERINTENDENT SUSAN CONNELL et al.,

               Defendants.

                                  6:17-cv-750
                                  (ECC/MJK)

Ameer N. Benno, Esq., *for Plaintiff*
Jennifer J. Corcoran, Asst. Att'y General, *for Defendants*

**Hon. Elizabeth C. Coombe, U.S. District Judge:**

**MEMORANDUM-DECISION and ORDER**

## I.    INTRODUCTION

On April 20, 2012, plaintiffs Shikema Williams, as administratrix of the estate of Frederick Velez, Frederick Hall, and Shamia Hall, by her mother and natural guardian, Sabrina Hall, filed this 42 U.S.C. § 1983 action in New York State Supreme Court, Kings County, against Oneida Correctional Facility employees Superintendent Susan Connell, Deputy Superintendent Peter Naughton, Sergeant Ralph Ciacca, Captain Earl Bell, Corrections Officer (C.O.) Theodore Elliot, C.O. Alan Andre, C.O. Leslie Bailey, C.O. David Piersall, C.O. Michael Bolen, C.O. Vincent Sansevieri, C.O. K. Klein, C.O. J. McNeil, C.O. B. Frey, C.O. Gatley, C.O. Avery, C.O. Theall, Nurse Iseneker, and John Does #1-15.  Dkt. No. 1 at 9–41.

The individual plaintiffs are immediate family members of Frederick Velez (Velez), who was killed while incarcerated at Oneida Correctional Facility in 2009.  Dkt. No. 1 at 11–12. Plaintiffs allege that defendants failed to intervene and protect Velez during a protracted altercation

between Velez and another incarcerated individual, Jose Rodriguez Jr. (Rodriguez), which culminated in Rodriguez fatally stabbing Velez. *Id.* at 9–41.

The original complaint asserted causes of action for violations of plaintiffs' and Velez's federal and state constitutional rights. Dkt. No. 1 at 34–40. On July 19, 2012, defendants removed the action to the District Court for the Eastern District of New York under 28 U.S.C. § 1441(c). *Id.* at 1–3. Plaintiffs subsequently amended their complaint to reflect the death of Velez's mother, Christine Cox. Dkt. No. 36.

On July 11, 2017, this action was transferred to the Northern District of New York. Dkt. No. 38. A short time later, plaintiffs amended their complaint for the second time, and the second amended complaint became the operative pleading. Dkt. No. 55. On November 21, 2017, defendants moved to dismiss the second amended complaint in its entirety. Dkt. No. 58. On July 18, 2018, Senior U.S. District Judge Thomas J. McAvoy issued a decision and order granting the defendants' motion in part and denying it in part. Dkt. No. 63. The surviving claims include those brought by Shikema Williams, as administratrix of Velez's estate, against the named defendants for Eighth Amendment violations pursuant to 42 U.S.C. § 1983. *Id.* at 23.

On February 14, 2025, defendants moved for summary judgment on plaintiff's remaining claims. Dkt. No. 155. On December 16, 2025, after defendants' motion was fully briefed, *see* Dkt. Nos. 161–64, the matter was reassigned to this Court for all further proceedings, Dkt. No. 165.

## II.    BACKGROUND[1]

In April 2009, Velez was incarcerated at Oneida Correctional Facility (Oneida C.F.).  Dkt. No. 155-2 ¶ 1.  Velez and Rodriguez "were housed in the G-Dormitory housing unit (G-[D]orm)."  *Id.* at ¶ 2; Dkt. No. 162 ¶ 136.  The G-Dorm had an area of dormitory "cubes" for each individual, a corrections officer station (the officer's station), and "two dayrooms where incarcerated individuals could congregate and watch television or play . . . games."  Dkt. No. 155-2 ¶ 3.

In 2009, one corrections officer was stationed within G-Dorm (the dorm officer) with at least one other officer assigned in a 'rover' position, rotating between G-Dorm and another housing unit.  Dkt. Nos. 155-2 ¶ 4; 162 ¶ 4.  Dorm officers conducted rounds of their assigned dorm at approximately 30-minute intervals.  Dkt. No. 162 ¶ 119.  Rovers would also conduct rounds of their assigned dorms, sometimes together with dorm officers.  *Id.* ¶ 120.  When a dorm officer was not actively conducting rounds, they would primarily sit at the officer's station.  Dkt. Nos. 155-2 ¶ 5; 162 ¶ 5.  To the extent that a corrections officer was unable to directly view an area from the officer's station, they used mirrors to observe the blind spots.  Dkt. Nos. 155-2 ¶ 6; 162 ¶ 6.  Dorm officers would also conduct a search of one or two randomly selected cubes per shift.  Dkt. No. 162 ¶ 122.

In April 2009, C.O. David Piersall was employed as the regular G-Dorm officer.  Dkt. No. 155-2 ¶ 7.  C.O. Leslie Bailey worked as a rover at that time, making rounds between G-Dorm and neighboring H-Dorm throughout his shift.  *Id.* ¶ 8.  On April 24, 2009, Piersall and Bailey were both working the afternoon shift, which ran from around 3:30 p.m. to 11:30 p.m.  Dkt. No. 162 ¶¶

---

[1] The following facts are drawn from Defendants' Statement Pursuant to Rule 56.1, Dkt. No. 155-2, and Plaintiff's Response to Defendants' Statement Pursuant to Rule 56.1, Dkt. No. 162, to the extent those facts are well-supported by pinpoint citations to the record, and the exhibits the parties have submitted.  Disputed facts are noted. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

87, 92.  C.O. Michael Bolen was also working that shift, as a rover between I-Dorm and J-Dorm. *Id.* at ¶¶ 226–27; Dkt. No. 155-2 ¶ 9.  Bolen's responsibilities also required him to go to G-dorm at times.  Dkt. Nos. 155-2 ¶ 9; 162 ¶¶ 226–27.  To the extent the parties dispute the exact sequence of events that transpired leading to Velez's death, the Court will address their factual allegations separately.

### A.    Defendants' Statement of Facts

On the evening of April 24, 2009, Piersall conducted numerous rounds on G-Dorm. Rosenberg Aff. Exh. C (Piersall Dep.) at 97, Dkt. No. 155-6.  During many of those rounds, he observed Velez and Rodriguez playing a game in the large dayroom.  *Id.*  Prior to April 24, 2009, Piersall had neither spoken to nor had issues with Velez or Rodriguez.  *Id.* at 88–90.

Around 7:00 p.m. on April 24, 2009, during or just after the "evening dinner run," Bolen conducted a round on G-Dorm.  Dkt. No. 155-2 ¶ 9; Rosenberg Aff. Exh. E (Bolen Dep.) at 21– 22, Dkt. No. 155-8.  He observed individuals playing a game in the large rec room, but does not recall seeing Velez or Rodriguez, specifically.  *Id.* at 56–58.  At around 9:15 p.m. on April 24, 2009, Piersall and Bailey conducted a headcount of the incarcerated individuals housed in G-Dorm, and all were accounted for.  Piersall Dep. at 52-53.

At 10:00 p.m. on April 24, 2009, the lights in G-Dorm were turned off, marking the beginning of quiet hours.  Piersall Dep. at 104–05; Rosenberg Aff. Exh. D (Bailey Dep.) at 58, Dkt. No. 155-7.  A half hour later, Piersall saw an incarcerated individual standing and speaking near Velez's dormitory cube.  Piersall Dep. at 116–17; Dkt. No. 155-2 ¶ 11–12.  Piersall, seated at the officer's station, stood up to see who the incarcerated individual was speaking to.  Piersall Dep. at 104–05.  Through a window, Piersall observed that the incarcerated individual was speaking to Velez, who was standing in his cube.  *Id.* at 115-16.  At that time, both Piersall and Bailey were in

the officer's station.  Dkt. No. 155-2 ¶¶ 11.  Both found it unusual that Velez was speaking in a "raised tone" in his cube during quiet hours.  Dkt. No. 155-2 ¶ 12; Piersall Dep. at 121; Bailey Dep. at 65–66.

A couple of minutes later, Velez walked out of his cube and past the officer's station to use the restroom.  Piersall Dep. at 102–03; Bailey Dep. at 60–62.  Once Velez exited the restroom, Piersall asked him why he was speaking during quiet hours.  Piersall Dep. at 102–03; Bailey Dep. at 65.  Velez stated that the other incarcerated individual had asked if he wanted to play cards, but Velez declined.  Piersall Dep. at 102; Bailey Dep. at 65, 67–68.  Velez informed Piersall that he was going to bed, and walked back to his cube.  Piersall Dep. at 102–103, 122; Bailey Dep. at 64–65, 76.  According to Piersall and Bailey, Velez did not make any reference to Rodriguez during that interaction.  Piersall Dep. at 122; Bailey Dep. at 69.  Piersall also testified that Velez did not seem upset or express any concern for his safety at that time, and that he did not indicate that he had an argument with any other inmate.  Piersall Dep. at 122.

At approximately 10:40 p.m., Bailey left the officer's station in G-Dorm to conduct a round on G-Dorm and H-Dorm.  Bailey Dep. at 89–90.  By 11:00 p.m., Bailey was back at the officer's station in G-Dorm, where Piersall was seated.  Bailey Dep. at 94.  Piersall had just completed a round on G-Dorm.  Piersall Dep. at 136–37.

At approximately 11:05 p.m., Piersall and Bailey heard a commotion coming from the dormitory cube area.  Piersall Dep. at 124–26; Bailey Dep. at 97.  Both described the noise as sounding like a chair hitting the floor.  Piersall Dep. at 124; Bailey Dep. at 97.  According to Bailey, he was not initially alarmed at the sound, because inmates routinely moved chairs between the recreational area and their dormitory cubes.  Bailey Dep. at 101.

Piersall and Bailey got up from the officer's station and walked down the hallway towards the cube area. Piersall Dep. at 137; Bailey Dep. at 100. Bailey, who was ahead of Piersall, saw Velez and Rodriguez exchanging punches. Bailey Dep. at 101–03. When Bailey turned to go down the aisle between the dormitory cubes, where the men were fighting, he saw Rodriguez throw a chair at Velez. *Id.* at 107–08. Bailey stopped to call for backup, while Piersall proceeded toward Velez and Rodriguez. *Id.* at 111–13. Piersall told Velez and Rodriguez to "break it up," and they complied. Piersall Dep. at 146. Then, Piersall escorted Velez over to a wall to conduct a pat frisk, and Bailey escorted Rodriguez out to the hallway and conducted a frisk. *Id.*; Bailey Dep. at 120–21.

Bolen and other corrections officers arrived on the scene in response to Bailey's radio transmission. Bailey Dep. at 120–21. Bolen approached Piersall, who was standing next to Velez, and Piersall told him that there was a two-man fight involving Velez and another individual who was being secured by Bailey. Bolen Dep. at 43–44, 48. Bolen offered to stay with Velez so that Piersall could assist Bailey. *Id.* In the hallway, Bailey placed Rodriguez in restraints and other corrections officers escorted him to the infirmary while Bailey stayed back and spoke to Sergeant Ralph Ciaccia at the officer's station. Bailey Dep. at 123–25.

Seconds after Bolen took over for Piersall, C.O. J. McNeil arrived and took Bolen's place. Bolen Dep. at 45. Velez was moving his hands against the wall, and as McNeil instructed him to stop moving Velez slumped over. *Id.* at 55, 59. McNeil continued to instruct Velez to stand until Bolen pointed out a puddle of what appeared to be blood-tinged urine pooling at Velez's foot. *Id.* at 59. Then, Velez collapsed. *Id.* at 59–60; Piersall Dep. at 150–52.

Bolen and McNeil waved Ciaccia over from the officer's station. Bolen Dep. at 60–61. Ciaccia came and lifted Velez's shirt, revealing puncture wounds. *Id.* at 66. Several corrections

officers assisted in strapping Velez to a backboard, carrying him off the unit, and placing him "into a transport van [to go] to the facility's emergency room." Dkt. No. 155-2 ¶ 26. An ambulance subsequently arrived and took Velez to Rome Central Hospital, where he was pronounced dead. *Id.* ¶¶ 29–30.

After Velez was taken to Rome Central hospital Ciaccia returned to G-Dorm. Rothman Decl., Exh. 25 (Ciaccia Dep.) at 99–100, Dkt. No. 161-25. According to Bolen, Ciaccia spoke with Bailey and Piersall at the officer's station, and they informed him that the fight had started over a board game. Bolen Dep. at 74–75. Corrections officers who were still on G-Dorm, including Bailey and Bolen, searched for the weapon used to stab Velez. Bailey Dep. at 126–27. Bolen recovered a weapon from a trash can, and Ciaccia instructed him to take the weapon to the evidence locker and wait for the New York State Police to retrieve it. Bolen Dep. at 81.

In the days that followed the stabbing, Bailey reportedly told Bolen that he had seen the fight. Bolen Dep. at 76–77. Bolen also spoke to Piersall, who told him that the fight started in the day room over a board game. *Id.* at 77.

### B.    Plaintiff's Statement of Facts

On April 25, 2009, Rodriguez gave a statement to the New York State Police. According to Rodriguez, he was playing dominos with Velez in the dayroom. Rothman Decl., Exh. 6 (Rodriguez Statement) at 1, Dkt. No. 161-6. Velez and Rodriguez got into an argument over cheating, and as Rodriguez got up from the table and started walking away, Velez punched Rodriguez in the head. *Id.* Rodriguez challenged Velez to a fight, but Velez refused and went to his cube. *Id.* Rodriguez proceeded to go to the bathroom, get a plastic container out of the garbage, and defecate in it. *Id.* at 1-2. Rodriguez mixed water with the feces in the container to make it soft and went to Velez's cube. *Id.* at 2. Rodriguez and Velez then engaged in a verbal altercation

at Velez's cube, and Rodriguez threw the container in Velez's face. *Id.* Investigating members of the New York State Police subsequently found fecal matter by Velez's cube, consistent with having been thrown by someone. Rothman Decl. Exh. 7 (NYSP Supp. Report) at 4, Dkt. No. 161-7.

In his statement, Rodriguez then describes that he went back to his cube, then back to the dayroom. Rodriguez Statement at 2. Rodriguez stopped at Velez's cube, and observed Velez had his gloves on. *Id.* Rodriguez stated, "Let's go," but Velez would not come out of his cell. *Id.* Rodriguez went to the dayroom to get in his chair, then went to Velez's cube, and then again back to the dayroom. *Id.* Rodriguez observed Velez getting the mop wringer from the sink as he was leaving the dayroom with his chair, to go back to his cube. *Id.* As soon as Velez saw Rodriguez, Velez went into his cube. *Id.* As Rodriguez walked by Velez's cube, Velez stepped out of his cube with the mob wringer. *Id.* Velez blocked Rodriguez, and Rodriguez threw the chair at Velez. *Id.* Velez jumped over the chair and "came at" Rodriguez, swinging the mop wringer at him from overhead. *Id.* At that point, Rodriguez put his left hand up to block Velez and stabbed Velez with a knife he had been hiding throughout the G-Dorm for approximately one year. *Id.* Velez put his hands up and dropped the mop wringer. *Id.* The corrections officers responded at that time, and Rodriguez threw the knife down the hall. *Id.*

Rodriguez also testified about the events leading to Velez's death at his disciplinary hearing surrounding the violations assessed against him, describing the ongoing altercation between himself and Velez throughout that evening. Rothman Decl. Exh. 8 (Hearing Transcript), Dkt. No. 161-8. Bailey also testified at the disciplinary hearing, stating that Velez was behaving "out of the ordinary" that evening, to the extent he was talking to other inmates after lights out. *Id.* at 14-15. Bailey further stated that they confronted Velez to ask "what was wrong," and Velez did not

indicate that there was anything to be concerned about. *Id.* at 15. Bailey also testified that he had conducted a round at approximately 11:00 pm, at which time Rodriguez was in his cube. *Id.* at 15-16.

Rodriguez pled guilty to manslaughter in the first degree on August 16, 2010. At the plea allocution, Rodriguez stated that "the two guards that were sleeping, they heard the chair . . . and they started running and they said stop fighting, stop fighting." Rothman Decl. Exh. 9 (Plea Allocution) at 16, Dkt. No. 161-9.

The record also contains statements taken by the New York State Police from other incarcerated individuals on the G-Dorm following the incident. According to one witness, Velez and Rodriguez had been in a physical altercation earlier in the evening, during which Velez punched Rodriguez in the face. Rothman Decl. Exh. 10 (NYSP Incident Report) at 7, Dkt. No. 161-10. The fight was broken up by other inmates. *Id.* Another incarcerated individual provided a supporting deposition, in which he stated, among other things, that he observed Rodriguez "walking back and forth in front of Velez's cube" and "taunting" Velez for over a period of one to two hours. Rothman Decl. Exh. 11 (Childers Supporting Deposition) at 2. At approximately 10:00 p.m., this witness observed Rodriguez "carrying a shank in his right hand. He would stop in front of Velez's cube and say something like, this is for you, you're done," and show Velez the shank. *Id.* The witness then described observing the ensuing fight between Velez and Rodriguez, and Rodriguez stab Velez. *Id.*

## III.    LEGAL STANDARD

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see*

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles*

*v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

### A.    Plaintiff's Withdrawal of Claims

In its response to Defendants' motion for summary judgment, Plaintiff states that "[a]fter having had the benefit of obtaining and reviewing a fully developed factual record, plaintiff hereby withdraws her claims against all defendants except Officers Bailey, Piersall, and Bolen, and Deputy Superintendent Naughton and Superintendent Connell."   Dkt. No. 163 at 6 n. 1. Accordingly, Defendant's motion for summary judgment is granted as to Defendants Ciaccia, Elliot, Andre, Sansevieri, Klein, McNeil, Frey, Gatley, Avery, Bell, and Theall, and these claims are dismissed with prejudice.

### B.    Eighth Amendment Failure to Protect

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "Prison officials [thus] have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.") (internal quotation marks omitted). However, "not . . . every injury suffered by one prisoner at the hands of another" merits liability pursuant to 42 U.S.C. § 1983. *Id*. "Liability for such an injury is imposed only when the prison officials' actions or omissions demonstrate 'deliberate indifference' to the safety of the inmates in their custody, 'mere

negligence will not suffice.'"  *Staton v. Farrell*, No. 1:20-cv-01120, 2023 WL 10354380, at *5 (W.D.N.Y. Sept. 29, 2023), *report and recommendation adopted*, 2024 WL 1051986 (W.D.N.Y. Mar. 11, 2024) (quoting *Hayes*, 84 F.3d at 620).

For claims based on an alleged failure to protect a prisoner against an assault by another inmate, the test for deliberate indifference requires a plaintiff to demonstrate that: (1) he is "incarcerated under conditions posing a substantial risk of serious harm"; and (2) the "defendant prison officials possessed sufficient culpable intent." *Hayes*, 84 F.3d at 620; *accord Farmer*, 511 U.S. at 833-34. As to the second prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *See Farmer*, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (explaining that this state of mind is "more blameworthy than negligence" and is "equivalent to criminal recklessness").

### 1.    Defendants Connell and Naughton

Defendants argue that Plaintiff's failure-to-protect claims against Connell and Naughton should be dismissed because Plaintiff has not demonstrated that Connell and Naughton were personally involved in any constitutional violation.  Dkt. No. 155-1 at 7-11.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). The Supreme Court has made it clear that a defendant may only be held accountable for his own actions under Section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a

constitutionally protected characteristic.").  In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). This is true even for supervisory officials. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("There is no special rule for supervisor liability."). "[A] plaintiff must plead and prove 'that each Government-official defendant, [including supervisors,] through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676).

Here, Plaintiff contends that Naughton and Connell demonstrated deliberate indifference to Velez's safety by (1) ignoring safety risks and failing to take action to reduce or eliminate them, resulting in the creation and concealment of the shank that was used to kill Velez, and (2) failing to order the search of Rodriguez's cube, or a "full dorm-wide search" of the G-Dorm, at any time prior to Velez's death.  Dkt. No. 163 at 25-26.

Usually, a particularized threat to the inmate-plaintiff's safety is required to satisfy the subjective prong of the deliberate indifference analysis.  A failure to protect claim cannot be based on a defendant's knowledge of a "general risk" of harm to an inmate. *See, e.g., Hogan v. Fischer*, No. 09–cv–6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (internal citation omitted) (holding that the failure to protect the plaintiff against a general threat of harm is insufficient to raise a failure-to-protect claim under the Eighth Amendment), *vacated in part on other grounds* 738 F.3d 509 (2d. Cir. 2013); *see also Ramlogan v. White,* No. 20 Civ. 5879, 2024 WL 1313417, at *6 (S.D.N.Y. Mar. 27, 2024).

However, a Plaintiff may establish a claim by showing that the defendants knew of a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff and that the measures they should have taken in response to such prior attacks would have prevented the attack on the

plaintiff. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013) (citing *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at *6 (S.D.N.Y. Sept. 25, 2000)). Courts have also held that "if there is 'evidence that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past and the circumstances suggest that the [defendant] . . . had been exposed to information concerning the risk,' a factfinder may infer that the defendant had actual knowledge of the risk." *Warren v. Goord*, 579 F. Supp. 2d 488, 495 (S.D.N.Y. 2008), *aff'd*, 368 F. App'x 161 (2d Cir. 2010).   In *Morgan v. Dzurenda*, 956 F.3d 84 (2d Cir. 2020), the Second Circuit reversed the district court's grant of summary judgment to a prison captain and warden where a prisoner had written to these officials expressing his fears for his safety. The Court concluded that the plaintiff "raised a question of material fact as to whether 'a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,' such that a trier of fact could find that [officials] 'had actual knowledge of the risk' posed" by the person who had attacked the plaintiff. *Id*. at 90 (citations omitted).[2]

Here, Plaintiff has failed to raise a genuine dispute of material fact with respect to the subjective prong of the deliberate indifference analysis as against Naughton and Connell.  There is no evidence, and Plaintiff does not meaningfully contend, that Naughton or Connell had actual knowledge of a specific risk of harm that Rodriguez posed to Velez prior to April 24, 2009.  The record suggests that Velez and Rodriguez had a "friendly" relationship prior to the underlying events.  Bailey Dep. at 75.

---

[2] Notably, the Second Circuit upheld the award of summary judgment dismissing Plaintiff's failure-to-protect claims against two other defendant-officials, finding that Plaintiff's warnings to them "lacked detail and failed to notify them of a 'substantial risk of serious harm.'" *Morgan,* 956 F.3d at 90.

Nor has Plaintiff shown these defendants were on notice of a general risk to all inmates, or that the conditions at Onedia C.F. presented a risk due to pervasive inmate-on-inmate violence. Viewing the evidence in the light most favorable to Plaintiff, weapons were found generally throughout Oneida C.F. "in the months leading up to April 24, 2009." Dkt. No. 163 at 15-16. These weapons were crafted from a myriad of different materials, including pieces of metal, plastic, pens, a can lid, and razor blades. *Id.* In general, however, "a failure to protect claim requires more than a showing that the correctional facility contains dangerous conditions. Rather, the plaintiff must demonstrate that [the defendant was] deliberately indifferent to the risks those dangers posed to the plaintiff." *Edney v. Kerrigan*, No. 00–cv–2240, 2004 WL 2101907, at *6 (S.D.N.Y. Sept. 21, 2004); *see also Melo v. Combes*, No. 97–cv–0204, 1998 WL 67667, at *5 (S.D.N.Y. Feb. 18, 1998) (finding the second prong of the plaintiff's failure to protect claim was not satisfied because the plaintiff's contentions that "bullets, and eight to ten inch store bought knives ha[d] been found repeatedly" at the facility were not sufficient to allege that the defendants had knowledge of the danger to the plaintiff himself "as opposed to issues of prison safety in the most general sense").

According to Connell, she encountered less than fifteen stabbing incidents throughout her entire DOCCS career, with "not many" of them occurring at Oneida C.F. Rosenberg Aff. Exh. A (Connell Dep.) at 15, 23, Dkt. No. 155-4. According to Naughton, he was only aware of one stabbing, Velez's, that occurred while he was Deputy Superintendent at Oneida C.F. Rosenberg Aff. Exh. B (Naughton Dep.) at 28, Dkt. No. 155-5. To his knowledge, security found weapons made from locker parts, like the one used to stab Velez, less than 10 times over 20 years. *Id.* at 90-91. On these facts, no reasonable juror could conclude that these defendants were aware of facts from which they could draw an inference that Velez faced a risk of harm at Oneida C.F., or

that this type of attack was otherwise foreseeable such that liability could attach. *Ramlogan*, 2024 WL 1313417, at *6 ("Because the touchstone here is foreseeability, courts routinely deny deliberate indifference claims based upon surprise attacks.") (cleaned up). Connell and Naughton are therefore entitled to summary judgment on Plaintiff's Eighth Amendment failure-to-protect claims.

### 2.    Defendants Piersall, Bailey, and Bolen

Defendants argue that Plaintiff's failure-to-protect claims against Piersall, Bailey and Bolen should be dismissed because Plaintiff cannot establish that they knew that a prior altercation between Velez and Rodriguez had occurred, nor that threats had been made against Velez by Rodriguez. Dkt. No. 155-1 at 14-18.

Defendants do not dispute the objective prong of Plaintiff's failure-to-protect claim for purposes of their motion for summary judgment. It is well settled that "[t]he objective prong may be satisfied where an inmate is subjected to violent acts at the hands of other inmates." *Liverpool v. Davis*, 442 F. Supp. 3d 714, 729 (S.D.N.Y. 2020) (citing *Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991) (holding that "an inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect him from the violent actions of other inmates may state a viable § 1983 cause of action")).

With respect to the subjective prong, Defendants argue, and the Court agrees, that the test for deliberate indifference in the context of an Eighth Amendment claim requires Plaintiff to establish that they were "subjectively aware" of a substantial risk, not merely that they should have known of the substantial risk. *See Darnell v. Pineiro*, 849 F.3d 17, 34-36 (2d Cir. 2017). Nevertheless, "[w]hether . . . prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence, and a fact finder may conclude that . . . prison official[s] knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Dublin v. N.Y.C. Law Dep't,* No. 10-cv-2971, 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) ("Direct evidence that prison officials knew of and disregarded a serious risk of harm to a prison inmate will rarely be available, and therefore an inmate may rely on circumstantial evidence.") (internal quotation marks omitted)).

Based on the record before it, the Court concludes that a reasonable jury could find that Piersall and Bailey were aware of a substantial risk that Plaintiff would be attacked by Rodriguez on the evening of April 24, 2009. Viewing the evidence in the light most favorable to Plaintiff, the altercation between Velez and Rodriguez began earlier in the evening and played out throughout the dorm over the course of several hours. After a dispute in the dayroom between the two incarcerated individuals that was broken up by other inmates, Rodriguez took the time to prepare a mixture of feces and water in the G-Dorm bathroom, come out to Velez's cube, and throw the concoction at Velez. Rodriguez then spent a considerable period of time in front of Velez's cube, threatening him. It is undisputed that Piersall and Bailey were both on duty in the G-Dorm that evening, and that Piersall's normal routine was to conduct rounds of the G-Dorm every 30 minutes. Bailey also conducted rounds on the G-Dorm that evening, and stationed himself there for some period of time throughout the night. It is undisputed that Piersall and Bailey observed Velez to be acting "unusual" that evening. The record further suggests that the correctional officers could observe the incarcerated individuals' conduct throughout the portion of the G-Dorm where the altercation played out from the officer's station and as they walked through the dorm. Thus, to the extent a reasonable jury could credit this evidence to conclude that Piersall

and Bailey must have been aware of the risk Rodriguez posed to Velez that evening, summary judgment is not appropriate.

With respect to Bolen, however, Plaintiff has failed to raise a genuine dispute of material fact concerning his knowledge of the risk that Rodriguez posed to Velez that evening. Even construing the facts in the light most favorable to Plaintiff, Bolen was working as the rover for the I- and J-Dorms on the evening of April 24, 2009, although his responsibilities required him to "sometimes" go to the G-Dorm. Bolen Dep. at 8-9, 20-21, 55-56. That evening, Bolen conducted rounds in the G-Dorm at approximately 7 p.m., to cover for the G-Dorm rover, Bailey. Bolen Dep. at 20-21, 55-56. Bolen did not otherwise return to the G-dorm until after Rodriguez stabbed Velez. *Id.* at 20-22. Bolen states that he was not present on the G-Dorm during the altercations between Velez and Rodriguez, and that he did not see anything out of the ordinary in the dayroom during his rounds earlier that evening. Bolen Decl. ¶ 7; Bolen Dep. at 57.

In an effort to defeat summary judgment, Plaintiff offers that Bolen "may have been present during part of the extended altercation." Dkt. No. 162 ¶ 4. However, in the absence of any additional circumstantial or direct evidence, no reasonable juror could conclude that Bolen knew, or must have known, about the risk Velez posed to Rodriguez for purposes of establishing his deliberate indifference. Accordingly, Defendants' motion for summary judgment is granted as to this claim, and Plaintiff's failure-to-protect claim against Bolen is dismissed with prejudice.

### C.    Eighth Amendment Failure to Intervene

"Allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) (collecting cases) (internal quotations omitted); *see also Luckey v. Jonas*, No. 18-cv-8103, 2019 WL 4194297, at *4 (S.D.N.Y. Sept. 4, 2019); *Molina v. Cnty. of Westchester*, No. 16-cv-

3421, 2017 WL 1609021, at *3 (S.D.N.Y. Apr. 28, 2017). "Within the general deliberate indifference framework, where a plaintiff alleges that a defendant failed to intervene in an ongoing attack by another inmate which the defendant witnessed, courts consider additional factors." *Morrell v. Sampson*, No. 9:22-cv-713 (AMN/ML), 2024 WL 4278647, at *8 (N.D.N.Y. Sept. 24, 2024). "This is because the analysis focuses on a correction officer's failure to intervene once an attack has started, as opposed to her duty to protect inmates from looming harm." *Johnson v. City of New York*, No. 23-cv-3091, 2025 WL 1042182, at *6 (S.D.N.Y. Feb. 18, 2025), *report and recommendation adopted*, 2025 WL 958334 (S.D.N.Y. Mar. 31, 2025) (citing *Early v. Quiros*, No. 3:24-cv-219, 2024 WL 3360648, at *5 (D. Conn. July 10, 2024)); *see also Little v. Cnty. of Nassau*, 708 F. Supp. 3d 252, 263 (E.D.N.Y. 2023).

Generally, "[i]naction by a corrections officer to intercede and halt an attack by a fellow prisoner is a sufficient basis for deliberate indifference." *Williams v. Connell*, 6:17-cv-750 (TJM/ATB), 2018 WL 3468213, at *4 (N.D.N.Y. July 18, 2018) (citation omitted). But officers are not liable merely by witnessing such attacks. To establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must establish that (1) the officer observed or had reason to know that plaintiff was involved in a physical altercation with another inmate; (2) the officer had reasonable opportunity to intervene; (3) the officer failed to intervene; and (4) the officer's failure to intervene was the proximate cause of injuries sustained by the plaintiff. *Rosen*, 667 F. Supp. 2d at 355; *accord Williams v. Russo*, No. 01-cv-6401, 2009 WL 185758 (W.D.N.Y. Jan. 26, 2009). In other words, a correction officer can be held liable for failure to intervene in an attack on an inmate if the officer "displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Rosen*, 667 F. Supp. at 360.

### 1.    Defendants Connell, Naughton and Bolen

Defendants argue that they are entitled to summary judgment on Plaintiff's failure-to-intervene claim against Connell, Naughton and Bolen, because they were not present on the G-Dorm when Rodriguez stabbed Velez.  The Court agrees.  There is no evidence to suggest that Connell or Naughton were physically present in the G-Dorm at any time on the evening of April 24, 2009, prior to Rodriguez stabbing Velez.  The record evidence also establishes that Bolen performed one round on the G-Dorm on the evening of April 24th, hours before Rodriguez stabbed Velez, and that Bolen did not see anything unusual. Plaintiff has therefore failed to demonstrate that there is sufficient evidence to permit a jury to conclude that Connell, Naughton, or Bolen had a realistic opportunity to intervene and prevent Rodriguez from stabbing Velez.  *See Saracina v. DuBrey*, No. 9:17-cv-864 (BKS/DJS), 2021 WL 4775191, at *5 (N.D.N.Y. Oct. 13, 2021) ("A defendant who is not in the vicinity of the alleged constitutional violation . . . cannot be held liable because he lacked reasonable opportunity to intervene.") (quoting *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342–43 (N.D.N.Y. 2010)).  Defendants are therefore entitled to summary judgment on this claim, and Plaintiff's failure-to-intervene claim against Connell, Naughton and Bolen is dismissed with prejudice.

### 2.    Defendants Piersall and Bailey

Defendants argue that Piersall and Bailey are entitled to summary judgment on Plaintiff's failure-to-intervene claim.  Dkt. No. 155-1 at 20.  Defendants' argument is based on their contention that Piersall and Bailey "were unaware of a threat to [] Velez's life at the time of the fatal incident . . . and did not observe the moment that [] Rodriguez stabbed [] Velez [because] they were in the officer's station at the time of the assault." *Id.* As previously discussed, Plaintiff has established a genuine dispute of material fact as to whether Piersall and Bailey were aware of

the risk Rodriguez posed to Velez throughout the evening of April 24, 2009.  Because a reasonable

juror could conclude that Piersall and Bailey had knowledge of the growing altercation between

the two incarcerated individuals, and in light of the disputed record evidence concerning how and

when Piersall and Bailey responded to the altercation, summary judgment is not warranted.  *See*

*Ismael v. Charles*, No. 1:18-cv-3597, 2020 WL 4003291, at *12 (S.D.N.Y. July 15, 2020)

("Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury,

unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.")

(citing *Sloley v. Vanbramer*, 945 F.3d 30, 47 (2d Cir. 2019)).  Accordingly, Defendants are not

entitled to summary judgment on Plaintiff's failure-to-intervene claim against Piersall and Bailey.

### D.    Qualified Immunity

Defendants raise a final, cursory argument that they are entitled to qualified immunity

because, assuming a violation occurred, reasonable officials "would not have comprehended that

their lack of actual knowledge as to a threat against [ ]Velez would be in violation of the Eighth

Amendment."  Dkt. No. 155-1 at 21.  At the outset, the issue of the remaining Defendants'

subjective awareness is disputed by the parties and will be determined by the finder of fact.  On

this basis alone, the application of qualified immunity at this juncture is inappropriate.

Furthermore,  "[t]he Second Circuit has made clear that defendants bear the burden of 'adequately

develop[ing]' and 'proving' a qualified immunity defense." *Soley v. Cnty. of Nassau*, No. 18-cv-

377, 2024 WL 1494383, at *16 (E.D.N.Y. Mar. 4, 2024) (quoting *Blissett v. Coughlin*, 66 F.3d

531, 538 (2d Cir. 1995)).  Here, Defendants fail to "develop" or "prove" any substantive argument

that qualified immunity is appropriate.  Accordingly, Defendants fail to meet their burden of

establishing an entitlement to qualified immunity, and their motion is denied in this regard.  *See*

*Shechter v. Comptroller of N.Y.C.*, 79 F.3d 265, 270 (2d Cir. 1996) (concluding that a "bald

assertion" of qualified immunity "provides no basis for a ruling" and fails to meet defendant's burden); *Crawford v. Coughlin*, No. 94-cv-494, 1996 WL 227864, at *4 (W.D.N.Y. Apr. 26, 1996) (finding that a "cursory analysis of qualified immunity clearly fails to meet defendants' burden of proof on the affirmative defense"); *Murray v. Coleman*, No. 08-cv-6383L, 2014 WL 2993748, at *7 (W.D.N.Y. July 2, 2014) ("It is not this Court's responsibility to do counsel's work for them by scouring the record to determine whether counsel's conclusory arguments hold water.").

## V. CONCLUSION

For these reasons, it is

**ORDERED,** that Defendants' motion for summary judgment, Dkt. No. 155, is **GRANTED in part and DENIED in part**, and it is further

**ORDERED,** that the Second Amended Complaint is **DISMISSED** as against Defendants Ciaccia, Elliot, Andre, Sansevieri, Klein, McNeil, Frey, Gatley, Avery, Bell, Theall, Connell, Naughton, and Bolen, and it is further

**ORDERED,** that Plaintiff Shikema Williams's, as administratrix of Velez's estate, Eighth Amendment failure-to-protect/failure-to-intervene claims against Defendants Piersall and Bailey shall proceed to trial.

Dated: February 10, 2026

Elizabeth C. Coombe
U.S. District Judge

- 22 -